THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RICHARD J. SCHUTZ, Defendant-Appellant.

(No. 57095; ▉▉▉▉▉▉▉▉)

First District—November 29, 1972.

Julius Lucius Echeles and Frederick F. Cohn, both of Chicago, for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Elmer C. Kissane and Robert Cohen, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE BURMAN delivered the opinion of the court:

This is an appeal from a judgment of the Circuit Court of Cook County finding the defendant, Richard J. Schutz, guilty of murder and sentencing him to not less than 35 nor more than 100 years in the Illinois State Penitentiary. On appeal, the defendant contends first that his oral and written confessions were coerced and therefore should not have been admitted into evidence and second that the trial court should have been required to find beyond a reasonable doubt, rather than by a preponderance of the evidence, that his confessions were voluntary. With respect to this second contention he argues that use of the lesser standard is constitutionally impermissible in cases where the only evidence of guilt is the defendant's confession.

At about 11:00 A.M. on November 24, 1967, the body of seventeen year old Cheryl Lyn Littlejohn was found in a wooded area in Niles, Illinois. An autopsy performed by the Cook County Coroner's office re-

vealed that the cause of her death was an "extensive fragmented fracture of the skull with resulting laceration of the brain." Subsequent testimony established that Miss Littlejohn had arrived in Niles at about 6:00 P.M. on November 23, 1967, to spend the Thanksgiving weekend with her cousin. She went out for a walk at about 8 o'clock that evening and was not heard from again. Her relatives notified the police that she was missing at about 11:00 P.M., and her body was discovered the next morning.

One or two days after the body was discovered, Gene Gargano, a detective of the Cook County Sheriff's Police, had two conversations with the defendant concerning Miss Littlejohn's death. The record does not reveal the exact substance of these conversations, but it appears that the defendant volunteered some information about the crime. It also appears that the defendant was employed at a service station near where the body was discovered and that his name was mentioned by some fellow employees who were questioned by the police.

On September 17, 1969, Charlotte Schutz, the defendant's wife, who was then separated from the defendant and living with her parents, called the Cook County Sheriff's Police and complained of a prowler near her parent's home. Donald Shaw, a detective who was investigating the Littlejohn killing, responded to the call. At the residence Charlotte Schutz told Shaw that she was concerned because she was in the process of being divorced from the defendant and she believed that the prowler was her husband. She also mentioned that the reason for the divorce was that she thought her husband to be a homosexual. On November 11, 1969, Detective Shaw responded to a call from Charlotte Schutz's mother concerning a possible tap on the family telephone. On that occasion Detective Shaw, Charlotte Schutz and Charlotte's mother had a conversation about the defendant in which it was revealed that while in high school the defendant had been examined by a psychiatrist and had been told that he had a "schitzophrenic personality." Shaw testified at trial that this statement first caused him to link the defendant with the murder, as he had been informed by a psychiatrist that the Littlejohn killing was the work of a person with a "schitzophrenic homosexual personality."

On November 12, 1969, Charlotte Schutz gave a formal statement to detectives Shaw and Gargano in which she stated that in 1967 she and the defendant had resided in an apartment building which was about five blocks from the scene of the murder. They had a Thanksgiving dinner at his grandmother's house in Bellwood, Illinois, on November 23, 1967, and returned home around 9:00 o'clock that night. November 23 was also the defendant's birthday, and he left the apartment about 9:30 to pick up a present from a friend who lived in Chicago. The de-

fendant returned some time between 2 and 3:00 o'clock the following morning. He woke up Charlotte and asked if she had heard about a girl being murdered in the area, saying that he had heard about it on the car radio while driving to his friend's house. A few days later, the defendant showed Charlotte the place where the girl's body had been found. When she asked how he knew so much about the crime, he stated that a police officer had come into the service station where he worked and had told him about it.

The foregoing events led the officers to detain the defendant for questioning on November 22, 1969. This questioning ultimately resulted in the confessions. As the defendant contends that his oral confession was coerced, we believe it necessary to set forth the circumstances surrounding his detention and the events following it in some detail.

Detectives Shaw and Gargano met the defendant in the parking lot of the Golf Mill Shopping Center at about 6:00 P.M. on November 22. Gargano recognized the defendant from their conversation in 1967. The officers identified themselves and asked if they could speak to him about the Cheryl Littlejohn murder. They stated that some new facts had come to light which they wanted to "straighten out" and asked the defendant if he would be willing to come to the station to discuss them. The defendant said that he would. Gargano then read to the defendant his constitutional rights from a card which the officers carried in their squad car. The card contained the following warnings:

> "Number 1: You have a right to remain silent.
> Number 2: If you choose not to remain silent, anything you say or write can and will be used as evidence against you in court.
> Number 3: You have a right to consult a lawyer before any questioning and you have a right to have the lawyer present with you during any questioning.
> Number 4: You not only have a right to consult with a lawyer before any questioning but, if you lack the financial ability to retain a lawyer, a lawyer will be appointed to represent you before any questioning, and you may have the appointed lawyer present with you during any questioning."

Both Shaw and Gargano testified that after each warning the defendant was asked if he understood, and he indicated that he did. This occurred in the parking lot alongside of the squad car. After the warnings had been given the officers drove the defendant to the police station.

Upon arriving at the station, Shaw and Gargano immediately took the defendant to the Detective Bureau where Shaw read to him his constitutional rights a second time. This time Shaw read from a printed form referred to by the officers as an "oral warning sheet." The substance of

this form was the same as that of the card used on the first occasion. After Shaw had read the warnings, the defendant signed the sheet to acknowledge that he had heard them. The defendant asked if he could telephone his girl friend to tell her that he would be late for dinner and was allowed to do so. He asked the officers what he should tell her, and Shaw said, "You can tell [her] whatever you like."

The officers began questioning the defendant at about 6:30 P.M. This questioning was of a general nature and related primarily to the defendant's activities on November 23, 1967. At about 7:30 P.M. the two officers and the defendant left the station and drove to the defendant's mother's house where the defendant lived. The purpose of this trip was to obtain a sweater which the defendant had been wearing on the night of November 23 and a hatchet which he had owned at the time. At the house the two officers waited outside while the defendant went in to get the hatchet and sweater. On the way back to the station the three stopped at a drive-in restaurant where they purchased coffee for the officers and a coca-cola for the defendant.

At the station, the defendant asked to telephone his girl friend a second time and was allowed to do so. He asked the officers how much longer it would be, and they replied that they would be finished as soon as they got things straightened out. The defendant was also allowed to telephone his mother, but there was no one at home. The questioning resumed some time between 8:30 and 9:30 P.M., this time focusing on when the defendant first received notice of Cheryl Littlejohn's death.

The defendant denied any involvement in the crime and stated that he had heard about the girl's death on his way to work on the morning of November 24. At 10:00 P.M. the defendant was given something to eat. He was also informed that his mother was in the police station, but he apparently did not wish to see her at that time. Around 11:30 P.M. the defendant informed the officers that as he knew more about the crime than he had originally related and that he wished to make a statement. He then said that he had decided to go looking for apartments on the night of November 23 and that while backing his car out of a dead-end street next to the field where the body was found he heard a loud thump and a scream. He was frightened and drove away, but later returned, entered the field and saw the girl's body. He did not report the matter to the police because he was afraid of being charged with the crime.

At about 1:00 A.M., the defendant told another version of the same story in which he admitted killing the girl. As a result of this he was formally charged with the murder. He stated that he wished to reenact the crime, and at about 2:30 A.M. the defendant, several officers and an assistant State's Attorney went to the place where the girl's body had

been found. When they returned to the station, Dan Miroballi, the Assistant State's Attorney, explained to the defendant his constitutional rights. The defendant stated that he understood his rights and that he desired to waive them and make a statement. He then dictated a statement to a court reporter in which he again described the events leading up to the murder. This statement was transcribed, and after he made some corrections, the defendant initialed each page and signed the last page. Detective Shaw and Gargano witnessed the defendant's signature. The defendant testified that he asked to sleep before signing the statement and was allowed to do so.

During the preliminary hearing on his motion to suppress the confessions, the defendant signed a jury waiver and requested that the court hear all of the motions in the case and the trial at the same time. After hearing extensive testimony, the court denied the defendant's motion to suppress his written confession, concluding that it was freely given.

On appeal the defendant contends that his written confession was tainted by the coercion used in obtaining his oral confession and therefor that it should have been suppressed. The defendant relies upon *Westover v. United States*, 384 U.S. 436; *United States v. Bayer*, 331 U.S. 532; and *People v. Taylor*, 33 Ill.2d 417. In *Taylor* he directs our attention to the following language:

> "If the original oral confession was unlawfully obtained, subsequent statements made while under the same constraint, although apparently voluntary, are nevertheless inadmissible."

We agree that this accurately states the law, and therefore we turn our attention to whether the oral confession was the product of coercion. It is undisputed that the officers did not beat the defendant or otherwise physically abuse him. The gravamen of the defendant's argument is that he was subjected to psychological coercion of the type so strongly condemned by the United States Supreme Court in *Miranda v. Arizona*, 384 U.S. 436. He urges that the evidence shows that (1) the police in the present case used the very interrogation techniques held inherently coercive in *Miranda;* (2) the officers implied that he would remain in custody until he made a statement to their satisfaction; (3) the officers continued to question him about the crime for five hours despite his repeated denials of involvement and (4) the warnings given him by the officers did not clearly state his right to have an attorney present at questioning if he so desired. After a careful review of the record we have concluded that these contentions are unfounded.

The defendant's constitutional rights were explained to him three times. Once, in the parking lot when he first encountered the officers,

second, at the police station immediately upon arrival, and again, at the police station prior to his dictating the written confession. In each instance the warnings given had both the form and substance of those required by *Miranda*. In each instance the defendant stated that he understood his rights and that he desired to waive them. With respect to his right to have an attorney present, Dan Miroballi, the Assistant State's Attorney, advised him as follows:

"Q. You know you have a right to have an attorney present of your own choice, and further, that a right to counsel with you prior to making a statement. You can talk to your attorney before you make this statement or before you answer any questions.

A. I understand.

Q. Do you want an attorney present?

A. Right now, no.

Q. You want to make a statement without an attorney present?

A. Right.

Q. If you cannot afford an attorney, we'll provide you one free.

A. Uh-huh.

Q. At our expense.

A. I'll wait for court to get that.

Q. You don't want an attorney now?

A. When I get to court, I do."

This indicates that the defendant was carefully and thoroughly informed of his right to have an attorney present and that he understood the nature of his right and waived it with respect to the confession.

Of course, the warnings are more than a preliminary ritual to interrogation, and the state must prove not only that the defendant was adequately informed of his rights, but also that his confession was freely given. On the evening of November 22, 1969, the officers began questioning the defendant at about 6:30 P.M., and he first implicated himself in the crime at around 11:30 P.M. He now argues that the fact that he was questioned for five hours before making his oral confession is evidence of coercion. However, the record does not reveal five hours of uninterrupted questioning. The questioning began at 6:30. It was of a general nature and did not require him to deny involvement in the crime. At 7:30 the defendant and the officers left the station and went to the defendant's mother's house. The defendant was allowed to enter the home alone. They did not return to the station until 8:30 or 9:00. Throughout the evening the defendant was allowed virtually unrestricted use of the telephone, and he made calls to his girl friend and mother. At 10:00 he was given food. At 10:30 or 11:00 his mother arrived, and he was informed of her presence. Thus the actual questioning between

6:30 and 11:30 covered three and one-half hours at most, and this was broken up by the visit to the defendant's mother's home, the telephone calls and the breaks for food. Both officers testified that they did not persist in asking the same questions in the face of the defendant's denials of involvement. The defendant accompanied the officers to the station voluntarily and never indicated a desire to leave or that the questioning should stop. If any of the procedures employed by the officers did affect the defendant psychologically, he was given ample opportunity throughout the course of events to regain his equilibrium. The element of seclusion in an intense, police dominated atmosphere found objectionable in *Miranda* is not present here.

■■ We have examined the cases cited by the defendant and believe them to be distinguishable from the present case. In *People v. Williams,* 33 Ill.2d 450, the defendant was subjected to five days of secluded confinement, repeated interrogation and physical abuse before he signed a confession. In *Burns v. LaVallee,* 436 F.2d 1352, the defendant was subjected to intense questioning for over 18 hours, was deprived of food for 30 hours and was not informed of his constitutional rights prior to questioning. In *Atwell v. United States,* 398 F.2d 507; and *Lathers v. United States,* 396 F.2d 524, the defendants were not informed clearly of their right to have an attorney present prior to and during questioning. In *Fendley v. United States,* 384 F.2d 923; *United States v. Oliver,* 421 F.2d 1034; *Smith v. Rhay,* 419 F.2d 160; *Windsor v. United States,* 389 F.2d 530; and *Chambers v. United States,* 391 F.2d 455, the defendants were not informed at all of their right to have an attorney present prior to questioning. We hold, therefore, that the trial court did not err in ruling that the oral statement was voluntary. In view of this, it follows that the written confession, which was substantially the same, was not tainted and was properly admitted into evidence.

We now turn to the defendant's contention that it was constitutionally impermissible for the trial court to have found by a preponderance of the evidence that his confessions were voluntary. He argues that in cases such as the present one, where the only evidence of guilt is the defendant's confession, a determination of admissibility by any standard less than that of beyond a reasonable doubt violates the command of *In re Winship,* 397 U.S. 358, that guilt in a criminal case must be proved beyond a reasonable doubt. He also argues that the requirement of proof of admissibility beyond a reasonable doubt is implicit in *Jackson v. Denno,* 378 U .S. 368, and he directs our attention to several cases from other jurisdictions which have interpreted *Jackson* to require the higher standard of proof. In our opinion, this argument is answered by the United States Supreme Court's recent decision in *Lego v. Twomey,* 404

U.S. 477. In *Lego,* the defendant advanced the same argument made by the defendant in the present case, "that he was not proved guilty beyond a reasonable doubt as required by *In re Winship,* 397 U.S. 358 (1970), because the confession used against him at his trial had been proved voluntary by only a preponderance of the evidence." (404 U.S. at 482.) In rejecting this argument, the court pointed out that whenever a confession is offered as evidence of guilt, the mandate of *Jackson* requires a two-step process. The court must determine whether the confession is voluntary, and if it concludes that it is, the trier of fact must then determine whether the confession is reliable. Each inquiry is separate from the other and therefore a determination by a preponderance of the evidence that the confession is voluntary does not *per se* result in a determination by this lesser standard that it is reliable or that the information contained in it is true. The court in *Lego* went on to say:

> "[W]e cannot accept the charge that judging the admissibility of a confession by a preponderance of the evidence undermines the mandate of *In re Winship,* 397 U.S. 358 (1970). Our decision in *Winship* was not concerned with standards for determining the admissibility of evidence or with the prosecution's burden of proof at a suppression hearing when evidence is challenged on constitutional grounds. *Winship* went no further than to confirm the fundamental right that protects 'the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' * * * A guilty verdict is not rendered less reliable or less consonant with *Winship* simply because the admissibility of a confession is determined by a less stringent standard." 404 U.S. at 486-87.

■■ With respect to the minimum burden of proof permissible in determining the voluntariness of a confession the court said:

> "Thus, the prosecution must prove at least by a preponderance of the evidence that the confession was voluntary. Of course, the States are free, pursuant to their own law, to adopt a higher standard." 404 U.S. at 489.

In Illinois, the well established standard is that a confession may be admitted into evidence if it is shown to be voluntary by a preponderance of the evidence. (See *People v. Golson,* 32 Ill.2d 398.) Therefore we hold that the trial court did not err in admitting the defendant's confession after having determined by a preponderance of the evidence that it was freely given. For the foregoing reasons the judgment is affirmed.

Judgment affirmed.

DIERINGER, P. J., and ADESKO, J., concur.