2 Ill. App.3d 11 (1971)
275 N.E.2d 742
THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v.
ANDERSON TURNER, Defendant-Appellant.
No. 54301.
Illinois Appellate Court  First District.
October 6, 1971.
*12 Gerald W. Getty, Public Defender, and James B. Haddad, Northwestern University Law School, (George L. Lincoln, and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.
Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle, William Hedrick, and Stephen J. Connolly, Assistant State's Attorneys, of counsel,) for the People.
Judgment affirmed.
Mr. JUSTICE DIERINGER delivered the opinion of the court:
The defendant, Anderson Turner, appeals from a judgment entered in the Circuit Court of Cook County finding him guilty of murder. He was sentenced to not less than 18 nor more than 30 years in the Illinois State Penitentiary.
The issues on appeal are whether the State proved the defendant sane beyond a reasonable doubt, whether admission into evidence of defendant's exculpatory statement was a violation of his rights under Miranda v. Arizona (1966), 384 U.S. 436, and whether the prosecutor's questions during cross-examination deprived the defendant of a fair trial.
On February 14, 1967, Janet Alexander, a prosecution witness, saw her neighbor, Miguel Morales, struggling with the defendant. Morales was *13 a 72-year-old man of Mexican descent, and the defendant was a 32-year-old Negro. The witness heard Turner ask Morales, "Why didn't you stay with my mother?" Morales said, "Who are you?" Both men then fell out of sight into the Morales apartment.
When the police arrived, Morales was lying on the floor, dead, and Turner was seated next to him with his feet over the body. It was stipulated by both parties that strangulation was the cause of death. Police officers testified that when they arrived Turner said to them, "My father is dead and I'll kill you if you come into my apartment." One officer went to call for additional help and upon returning observed the defendant attack his partner. After a struggle Turner was subdued and taken to the Third District Station.
The interior of the Morales apartment showed signs of a struggle and there was a butcher knife with a six-inch blade laying alongside of the body.
At the police station Turner was placed in the interrogation room while reports were filled out. He either fell or slid out of his chair and assumed a sitting position against a wall. The defendant also failed to answer any of the questions concerning constitutional rights, but when asked his name and address, he blurted out, "I didn't kill the old man." The interrogating officer said he smelled the "strong odor of alcohol" and characterized the defendant's speech as "very slurry" but understandable.
The killing occurred at approximately 3:30 P.M. At 8:30 A.M. Turner had consumed a pint of Wild Irish Rose wine. At 10:00 A.M. he arrived at the apartment of a friend, Miss Johnnie Mae Dennis. After fixing a record player he went to the store and bought some more liquor and returned to the apartment, where he consumed another pint of wine and a half-pint of gin. Turner testified that he went to the store with Miss Dennis and returned, but did not remember anything after that until he awoke in jail the next morning.
Anderson Turner's sister testified in his behalf. She stated that when they were children their father had pulled a gun on them and told them he would kill them because he was not going to take care of them the rest of his life. An uncle then took the gun away from him and threw him out of the house. She also said that four years previous her brother had begun drinking a fifth or two of liquor per day. On a couple of occasions it was like a stupor of some kind: "He wasn't falling down drunk or anything like that. It was like you know, out of his mind kind of thing. It was like as if you were talking to him, and he could hear you and see you but it was just no hearing, he just couldn't hear you, everything was, you know  ."
Two psychiatrists testified for the prosecution. One had examined the *14 defendant in May, 1967, and the other in December, 1968. Both had found him competent to stand trial and sane at the time of their examinations. When asked a hypothetical question based on the facts in evidence, neither expressed an opinion as to the defendant's sanity at the time of the killing. Both were certified members of the American Board of Psychiatry and Neurology.
The psychiatrist for the defense, Dr. Rothstein, testified that a hypothetical man behaving similarly to the defendant in his opinion suffered from an organic psychosis, in which a person reacts to alcohol in a semiautomatic way without actual conscious control over his behavior, and that it was an acute rather than permanent brain syndrome. Dr. Rothstein testified that alcohol might have an explosive effect upon his personality, yet his manual dexterity would not necessarily be impaired. Dr. Rothstein was not certified by the American Board of Psychiatry and Neurology.
 1, 2 The defendant's first argument is that the State failed to prove him sane beyond a reasonable doubt. The Illinois Supreme Court stated in People v. Gold (1967), 38 Ill.2d 510:
"This court has consistently held that once evidence is introduced which is sufficient to beget a reasonable doubt of sanity it becomes incumbent on the State to prove beyond a reasonable doubt that the accused had sufficient capacity at the time of the crime for its commission."
However, if the defendant fails to meet the burden imposed by law and does not introduce sufficient evidence to raise a "reasonable doubt" as to the defendant's sanity, the court will disregard the plea of insanity and the presumption of sanity will remain. In this case in order for a presumption of insanity to be established, the triers of fact would have to believe that the defendant was telling the truth when he said he blacked out from drinking and subsequently committed the murder. In a similar case, People v. Conrad (1967), 81 Ill. App.2d 34, the court said:
"He [defense psychiatrist] testified in response to a hypothetical question embodying defendant's version in the pertinent evidence and stated that in his opinion the actor in the hypothetical question at the time of the murder was unable to distinguish between right and wrong or to choose whether or not to do an act. However, Dr. Haines admitted on cross-examination that the hypothetical actor became unable to choose between right and wrong only at the time he blacked out. Therefore, if the jury did not believe defendant's testimony as to the blackout, then Dr. Haines' answer to the hypothetical question would be of no significance in establishing insanity.
 3 The credibility of the defendant is for the jury to decide. When the defendant was in the police station being asked his name and address, *15 he blurted out that he did not kill the old man. This would indicate that he realized what he had done and did not black out as he subsequently maintained. During his examination the defense psychiatrist did not perform any tests which would establish any organic disability, and there is no evidence that the defendant was ever treated for any disability previously.
In People v. Count (1969), 106 Ill. App.2d 258, the court discussed the issue of the weight to be given to the testimony of an examining psychiatrist:
"He [Dr. Haines, psychiatrist] was of the opinion that anything defendant told a psychiatrist in an examination made for the purpose of determining his legal sanity would be self-serving and unreliable. This finds support in common sense and in People v. Hester, 39 Ill.2d 489, 237 N.E.2d 466, `* * * a doctor who examines a patient merely for the purpose of qualifying as a witness ordinarily may not testify as to his medical opinions based upon subjective symptoms described by the patient because of the absence from this relationship of the normal trustworthiness accompanying symptomatic descriptions by a patient to a treating physician.'"
 4, 5 The Supreme Court of Illinois has held that "the question of a defendant's mental condition at the time of the crime is a question of fact to be determined by the trier of fact." (People v. Ford (1968), 39 Ill.2d 318.) In the instant case there is evidence which would enable the jury to believe the defendant was sane at the time of the commission of the crime.
 6 Next, the defendant complains it was error to admit his exculpatory statement into evidence and cites Miranda v. Arizona, 384 U.S. 436 as authority. But the facts of this case fit one of the express exceptions to the Miranda rule. The defendant made his statement, not as a result of interrogation, but voluntarily of his own free will during the time he was being asked for clerical information. This type of questioning is not within the meaning of "custodial interrogation." Miranda states: "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."
Although Miranda warnings were given the defendant prior to asking him for clerical information, it is argued that his condition precluded him from understanding. Nevertheless, no such warnings are required. In People v. Fognini (1970), 47 Ill.2d 150, the court stated:
"The preliminary questions asked an accused with respect to his name and address, which are part of the booking proceedings certainly do not amount to an interrogation in order to elicit incriminating testimony or admissions from the defendant. Therefore, no Miranda warnings or *16 hearings to suppress the evidence were required prior to hearing this testimony at trial."
Finally, the defendant claims that improper cross-examination denied him a fair trial. Prosecution testimony showed that a butcher knife was found near the deceased, and the defendant testified that he had been visiting Johnnie Mae Dennis, who lived in the same apartment building as the deceased. While cross-examining the defendant, the prosecutor engaged in this line of inquiry:
"Q. Now do you remember picking up a butcher knife and chasing Johnnie Mae with it?
A. No.
Q. Did you ever chase the kids with the butcher knife?
A. No.
Q. Do you remember picking up a butcher knife off her table?
A. No."
 7-9 No objections were made to this line of questioning, but the State offered no proof whatsoever that the defendant ever touched the butcher knife or ever chased Johnnie Mae Dennis or the children. The defendant characterizes the line of questioning as the "tactic of constructing a foundation for impeachment and then abandoning this objective immediately thereafter." If the witness denies he did those things inferred by the questioner, it is the duty of the questioner to produce evidence that those things were actually done, and it is improper to ask questions solely for the purpose of sowing suspicion in the minds of the jury. Nevertheless, we do not believe that it constitutes reversible error. The case of People v. Nuccio (1969), 43 Ill.2d 375, cited by the defendant, is distinguishable in that there were persistent and extensive improper questions asked, while there were just three here. More importantly, in Nuccio there were objections to some of the questions asked, as well as a motion for a mistrial at the conclusion of the questioning when it became obvious that no contrary proof was forthcoming. In the case at bar there were no objections to the questions and no motion for a mistrial. In People v. Ford (1960), 19 Ill.2d 466, the court said:
"An accused may not sit idly by and allow irregular proceedings to occur without objection and afterwards seek to reverse his conviction by reason of those same irregularities."
We believe the defendant waived his right to object on that ground. Furthermore, by itself, it would not constitute reversible error.
For these reasons the judgment of the Circuit Court is affirmed.
Judgment affirmed.
ADESKO, P.J., and BURMAN, J., concur.