THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GERALD MORRISSEY, Defendant-Appellant.

First District (5th Division)   No. 63040

Opinion filed May 27, 1977.

Michael Weininger, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Michael E. Shabat, and Edward H. Phillips, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder and sentenced to 16 to 35 years of imprisonment. An indictment alleged that defendant had murdered Herman A. Harris on July 14, 1969, at Cook County, Illinois. Prior to trial, defendant made motions to suppress certain statements and quash the arrest. The motions were denied. On appeal, defendant contends that the admission of evidence of other crimes denied him a fair trial and that he was not proven guilty beyond a reasonable doubt. However, under our holding, we need only discuss defendant's contention that the court erred in denying his motion to suppress all statements subsequent to his request to talk to his lawyer. We reverse and remand the cause for a new trial. At the pretrial hearing on the motions, the following relevant evidence was heard.

Terry Holland, a Kansas State Trooper, testified that on December 9,

1971, at approximately 8:20 p.m., he was patrolling an interstate highway near Topeka, Kansas. He noticed defendant walking on the highway, and arrested him for "hitchhiking." Defendant produced as identification a driver's license issued to Gerry Myers by the State of Ohio. After being searched for possible weapons, defendant rode in the patrol car while Holland checked with his radio dispatcher for warrants. Holland gave defendant a warning and released him at a restaurant.

Thereafter, the dispatcher notified Holland of two warrants. Defendant's physical description matched the subject of the second warrant; it was a murder warrant. When he returned to the restaurant, Holland received assistance from Kansas State Trooper Terry J. Scott. They entered the restaurant and arrested defendant. He was handcuffed, taken to Holland's car and placed in the right front seat. Holland testified that he was in the driver's seat. And Scott was in the right rear seat. Scott told defendant that he would be held for possible murder warrants from Cook County, Illinois. Scott asked defendant whether he knew his rights. Defendant indicated that he knew his rights, and Scott asked him if he wanted to be advised of them again. Defendant said he did, so Scott read the *Miranda* rights. After indicating that he understood those rights, defendant said "that he would like to fight extradition, and he wanted to talk to his lawyer." The dispatcher then gave additional information on the murder warrant, apparently mispronouncing defendant's name. Defendant correctly pronounced his last name. At that moment, Scott asked him for his real name. Defendant gave it. Scott and defendant conversed as Holland talked on the radio.

Holland further testified that he proceeded to his Division Headquarters to obtain more information concerning defendant. While Holland was inside the Headquarters, Scott and defendant remained in the car. Holland returned and the three of them went to the Shawnee County Jail. "Quite a bit of conversation" took place in the jail's squadroom, but Holland was "in and out" of the room. Defendant stated that he had been to California and Denver during the previous two years. When Holland asked defendant why he was fighting extradition, defendant answered that his lawyer advised him to fight it. Defendant was asked what kind of weapon he had used, he gave a response, but he refused to answer other questions. The questioning continued and he gave answers, although he declined to answer some questions.

After Holland completed processing defendant, Holland turned defendant over to the Shawnee County officials. At that point, defendant, who had been friendly and cooperative, shook hands with Holland and Scott and made parting remarks. No questions were then being asked; however, defendant said, "Well, all I did was kill a nigger." Holland further testified that defendant was not threatened, hit, beat, or coerced,

except that when defendant was apprehended in the restaurant, Scott said, "Hold it right there or I'll blow your head off." Apparently, this warning was given because Scott did not know if defendant was armed. Also, Holland recalled that after they got into the car, Scott told defendant: "We have you on a murder charge. Don't cause us any trouble because I will put a bullet into you."

On cross-examination Holland stated that Scott advised defendant, after he requested a lawyer, that he would have an opportunity to telephone his lawyer when they got to the County Jail. Holland then asked defendant why he wanted to fight extradition. Defendant replied that a lawyer had advised him to do so. Holland testified that, during the drive to the County Jail, Scott asked defendant whom he had killed; defendant stated in response, "Scotty. You know, it's just one of those things, shithouse fight, and somebody got killed." Scott noted that "the most he could get was manslaughter." Defendant then said that "one of the guys got him a super lawyer one—wanted a quick lawyer and got him 20 to 40 years." Holland also testified that he did not allow defendant to make any telephone calls at the County Jail. Furthermore, at the jail, defendant did not ask to talk to his lawyer.

Terry J. Scott, the Kansas State Trooper who had helped Holland apprehend defendant at the restaurant, testified that defendant was handcuffed and told that Scott was armed and defendant should not attempt to escape. Scott testified that he read the *Miranda* rights to defendant while in Holland's car. Scott asked defendant: "Do you understand these rights that I have explained to you? And having understood these rights do you wish to talk to us now?" Defendant responded: "I understand. I want to fight extradition. Can I call a lawyer?" Defendant could make a telephone call, Holland advised, when they reached the Shawnee County Courthouse. In a radio transmission, defendant's name was mispronounced. Defendant gave the correct pronunciation. So, Holland asked him, "What is your full name?" and defendant said, "Gerald Aloysius Morissey [sic]."

Scott testified that in three to five minutes, after leaving the restaurant, they arrived at Division One Headquarters. Holland got out of the car and went inside the building. Defendant asked for Scott's name which Scott then gave. "Is it all right if I call you Scotty?" defendant asked. "Yes, it is," replied Scott. He further testified that he asked defendant who he was supposed to have killed. "There was a bunch of us and this colored guy died," replied defendant. "It was just kind of a shithouse fight." After approximately 5 minutes, Holland returned to the car and they all proceeded to the Shawnee County Courthouse, reaching it in 3 to 5 minutes. Defendant had revealed that he had been on his way back to Chicago. Thus, Scott asked defendant why he wanted to fight extradition.

Defendant stated that he had been told by a friend that the Illinois authorities would be required to present their evidence at the extradition trial. Defendant asked Scott where they were going. And Scott informed him that they were going to the Shawnee County Courthouse where defendant would be confined in the jail. Scott also testified that he told defendant that Illinois officials, who could start extradition proceedings, would be contacted. Scott and defendant discussed whether the jail facilities were old or new.

Upon arriving at the County Jail, Scott and defendant conversed and "visited" in the sheriff's squadroom for approximately half an hour. Scott asked defendant where he had been since the warrant was issued. Scott further testified that defendant admitted to having been in Denver and on the West Coast. Scott also asked him who the colored man was he was supposed to have killed. But defendant did not want to answer that question. Scott recalled asking defendant what weapon he used or how the colored fellow died. "I don't carry a weapon because you are just asking for it if you carry a weapon," was the reply. There were five or six other questions which defendant declined to answer. Following the questioning, as Scott left defendant with the jail personnel, defendant shook hands with Scott and Holland and said, "When you get to Chicago, look me up and we will have a good time." An hour, estimated Scott, passed from the time he first saw defendant until they parted.

On cross-examination Scott indicated that he had not heard defendant say, "Well, all I did was kill a nigger." Indeed, Scott claimed that defendant's parting statement to him was, "When you get to Chicago, look me up and we will have a good time." Earlier, when Scott finished reading the *Miranda* rights, he asked defendant, "Did you wish to waive those rights?" After defendant said he wanted to call his lawyer, Scott said, "Okay." Scott also testified that when they were at Division One Headquarters and the County Jail, he let defendant use a telephone to contact his lawyer, but defendant did not make a call. During redirect examination Scott admitted defendant was not taken inside Division One Headquarters.

Based upon the foregoing testimony, the motion to suppress was denied. Accordingly, the court found that defendant's statements were voluntary; the request for a lawyer was only for the purpose of fighting extradition and defendant deliberately waived his *Miranda* rights by refusing to answer some questions and answering others.

At trial, before calling the Kansas State Troopers, the State moved to limit the scope of examination and cross-examination by barring any questions relating to defendant's statement concerning the person who got a lawyer for a trial which resulted in a sentence of 20 to 40 years. Defense counsel objected by saying to the court: "They cannot take a

testimony out of context. They must have all of the testimony or none at all. You heard the testimony on the motion to suppress, and that is the testimony that should be heard on trial." The court sustained the objection and allowed "the statement to go in."

OPINION

■■ In the patrol car, Scott asked defendant for his real name. It was a proper preliminary question, not meant to elicit an incriminating admission from defendant. A defendant's name is merely clerical information. (See *People v. Fognini* (1970), 47 Ill. 2d 150, 265 N.E.2d 133, *cert. denied* (1971), 402 U.S. 911, 28 L. Ed. 2d 653, 91 S. Ct. 1389; reasserted in *People v. Turner* (1971), 2 Ill. App. 3d 11, 15, 275 N.E.2d 742.) Therefore, it was not error to admit defendant's response, which gave his name, into evidence.

■■ It was error to admit any of the other responses into evidence. Enroute to the jail, defendant was questioned as to the identity of the victim and why defendant wanted to fight extradition. At the jail, Scott asked defendant about the use of a weapon. Scott asked defendant where he had been since the issuance of a warrant. The case of *People v. Parnell* (1975), 31 Ill. App. 3d 627, 334 N.E.2d 403, is applicable to the instant case. In *Parnell,* at the scene of a fatal shooting, the defendant was twice advised of her *Miranda* rights; she twice indicated that she wanted to see a lawyer before making any statement. Thereafter, she was taken to a police station where a police officer advised her of her *Miranda* rights. During the performance of a dermal nitrate test on the defendant's hand, the officer asked her what had happened earlier. The defendant replied that "she had words with the deceased that they had gotten into an argument and that she had shot him." The trial court granted a pretrial motion to suppress this statement. And the appellate court upheld the trial court's suppression order. As in *Parnell,* the issue in the instant case is whether an individual, who has asserted his right to remain silent and his right to counsel, may be questioned further, before he consults an attorney. By asking for a lawyer, defendant "indicated his intention to remain silent and interrogation should then have ceased." (*People v. Taylor* (1972), 6 Ill. App. 3d 343, 351, 285 N.E.2d 489.) Under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, defendant invoked his right to delay questioning until his attorney was present. In *Miranda* the court said:

> "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning." (384 U.S. 436, 474, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602, 1628.)

The leading case of *People v. Henenberg* (1973), 55 Ill. 2d 5, 11, 302 N.E.2d 27, emphatically supports the proposition that a violation of *Miranda* can occur when statements are obtained through interrogation following a request for an attorney.

In the instant case, defendant, shortly after his request for counsel, was asked whom he was supposed to have killed. In the sheriff's squadroom, questions were asked. Defendant's right to cut off questioning was not "scrupulously honored" at the time he requested a lawyer, in accordance with *Michigan v. Mosley* (1975), 423 U.S. 96, 104, 46 L. Ed. 2d 313, 96 S. Ct. 321. (*People v. Washington* (1976), 41 Ill. App. 3d 475, 480-81, 354 N.E.2d 501.) In *Mosley* the defendant was arrested on robbery charges. After he was advised of his *Miranda* rights by a detective, the defendant expressed his desire not to talk about the robberies. The detective immediately stopped the questioning and did not attempt to resume interrogation. More than 2 hours later, another detective gave the defendant *Miranda* warnings and questioned him about an unrelated homicide. The defendant then made a statement implicating himself in the murder. The court in *Mosley* believed that the questioning about the homicide did not violate *Miranda* because that second interrogation was restricted to a crime not involved with the earlier interrogation, and the defendant had been allowed to exercise his right to cut off questioning about the robberies. In *Mosley* the court declared that *Miranda* does not "create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." (423 U.S. 96, 102-03, 46 L. Ed. 2d 313, 321, 96 S. Ct. 321.) This court used the rationale of *Mosley* in *People v. Morgan* (1976), 39 Ill. App. 3d 588, 596, 350 N.E.2d 27. Specific facts in the *Morgan* case made it unnecessary to bar further custodial questioning of a suspect who had requested an attorney. In *Morgan*, when the suspect said he wanted to consult an attorney, the questioning ceased. Later, he changed his mind and clearly indicated that he wanted to speak without the assistance of a lawyer. On his own initiative, the suspect voluntarily sought an interview. However, in the case at bar, defendant after requesting counsel, was then questioned, and he never specifically indicated that he did not want a lawyer.

■■ *People v. White* (1975), 61 Ill. 2d 288, 335 N.E.2d 457, is distinguishable from the case at bar. (See *People v. Medina* (1976), 37 Ill. App. 3d 1029, 1036, 347 N.E.2d 424.) The defendant in the *White* case had *Miranda* warnings and he requested an attorney; questioning ceased, but an attorney was not provided. This failure to provide an attorney was a violation of the procedural safeguards established in *Miranda*. On the afternoon of that first day, the defendant was again advised of his *Miranda* rights and then questioned about different and unrelated

offenses. In the two days that followed, he was periodically interrogated about several unrelated offenses. Admissions were made concerning those offenses. The defendant finally confessed to the commission of a murder. He had been given the *Miranda* warnings before each period of interrogation. The effect of the violation of the defendant's *Miranda* rights was sufficiently dissipated by a time lapse, repeated *Miranda* warnings, and other intervening events so that the murder confession had a voluntary character. Therefore, that confession was properly received in evidence at trial. In this case, however, the interrogation of defendant began almost immediately after his *Miranda* request for a lawyer. That interrogation concerned the single offense of murder. There were no intervening events as found in *White*.

■■■ Our key concern is whether defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. (*Parnell*, at 630.) The State argues that "defendant selectively exercised his right to decline to answer questions." This factor indicates that he knew of his right to remain silent. But it does not indicate that he freely and voluntarily gave answers because of a desire to waive his right to remain silent and his absolute right to wait for the aid of counsel. Since defendant requested an attorney and his request was disregarded by the troopers, his statements during the subsequent questioning were not a product of waiver; those statements must be presumed a product of subtle compulsion. (*Parnell*; see *Miranda*, at 474.) Furthermore, we cannot assume that defendant silently waived his right to an attorney by failing to use a telephone to contact his lawyer. (*Parnell*.) Also, there is no evidence which gives sufficient support for the assumption that defendant's request for a lawyer was only for the purpose of fighting extradition.

The State contends that defendant can now complain only about the admission, at trial, of the statement: "Well, all I did was kill a nigger," since the other pertinent statements were admitted at the insistence of defendant and over the State's objection. Even assuming *arguendo* that the State's contention is correct, the confession, without more, gives us a sufficient reason to reverse and remand this cause for a new trial. We do not believe that the confession was a volunteered statement which should have been admitted at trial. The State notes that all questioning had terminated and the troopers were departing when defendant said, "Well, all I did was kill a nigger." The statement, however, followed a series of interrogations in the patrol car and at the jail, over a period of approximately one hour. The statement was "a delayed response to the prior questioning." (*People v. Hill* (1968), 39 Ill. 2d 125, 131, 233 N.E.2d 367, *cert. denied* (1968), 392 U.S. 936, 20 L. Ed. 1394, 88 S. Ct. 2305.) Since prior questioning violated *Miranda*, the statement should have been suppressed by the trial court. The record shows wilful or negligent

conduct, on the part of the troopers, which deprived defendant of *Miranda* rights. (*Michigan v. Tucker* (1974), 417 U.S. 433, 446, 41 L. Ed. 2d 182, 94 S. Ct. 2357.) As was previously stated, the trial court found that defendant's statements were voluntary; his request for a lawyer was only for the purpose of fighting extradition; and defendant deliberately waived his *Miranda* rights by refusing to answer some questions and answering others. Those findings were contrary to the manifest weight of the evidence. See *Medina*, at 1033.) As in *People v. Turner* (1973), 56 Ill. 2d 201, 207-08, 306 N.E.2d 27, the admission of defendant's confession was not harmless error beyond a reasonable doubt. We are of the opinion that the error could have contributed to defendant's conviction. *Chapman v. California* (1967), 386 U.S. 18, 26, 17 L. Ed. 2d 705, 87 S. Ct. 824.

For the reasons presented, the judgment of the Circuit Court of Cook County is reversed and the cause remanded for a new trial consistent with this opinion.

Reversed and remanded.

SULLIVAN, P. J., and MEJDA, J., concur.