THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
THOMAS RAY JAMES, Defendant-Appellant.

Fourth District   No. 15485

Opinion filed March 28, 1980.—Rehearing denied April 28, 1980.

Richard J. Wilson and David Bergschneider, both of State Appellate Defender's Office, of Springfield, for appellant.

Thomas J. Fahey, State's Attorney, of Danville (Gary J. Anderson and Robert J. Biderman, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE MILLS delivered the opinion of the court:

Murder—40 years.

Issue: *Miranda.*

We affirm.

James was found guilty by a jury of murder and armed violence. Judgment was entered only on the murder charge and a sentence of 40 years' imprisonment was imposed. (This sentence is to be served consecutive to a 30-year sentence imposed on an attempt murder conviction which is now on appeal to this court in case No. 15306.) Defendant challenges his murder conviction, arguing that the trial court erred in denying a motion to suppress his confession and further erred in admitting evidence as to certain telephone calls that defendant made after the victim's death.

### Suppression Hearing

Prior to trial, defendant moved to suppress certain statements he made to police officers following his arrest. A review of the evidence presented at the suppression hearing, where Judge Paul M. Wright presided, shows that defendant was arrested in a rural area of Vermilion County at approximately 5 p.m. on May 17, 1978. During the evening hours of the day before, the defendant had been involved in an altercation with Samuel Cartwright and defendant knew the police were looking for him in connection with this incident. When the arresting officer, Terry Carey, arrived at defendant's location, defendant held out his hands and said, "I did it." Defendant was then searched, handcuffed, and placed in Carey's squad car. Carey did not question defendant other than to ask his name.

While en route to the public safety building in Danville, Officer Carey radioed headquarters to request that the sheriff and an investigator meet him. Defendant asked Carey if he would be allowed to make a phone call at the jail to which Carey responded affirmatively. About a minute later, defendant requested that Carey inform him of his rights and Carey did so. Shortly thereafter, defendant asked if he could make a second phone call if necessary and Carey said he could. After another minute or two passed, defendant said that "he would like to talk to an attorney." Carey told him he would be allowed to do so. Carey did not attempt to question defendant during the trip to Danville.

Later, while still traveling in Carey's squad car, defendant asked how

seriously the man was injured. Carey responded, "Who?" Defendant then told Carey he was referring to the incident the night before and Carey did not respond. Defendant then asked how long he would get and Carey asked, "For what?" Defendant again stated he was referring to the incident on the previous night. Carey did not reply but once again told defendant he would be allowed to use a phone at police headquarters.

When they arrived at police headquarters, Carey told police investigator William Hartshorn that defendant had been advised of his rights, had asked to speak to an attorney and to use the telephone. Carey also told Hartshorn that he had advised defendant that he could do so. During this conversation, defendant was in an interview room in the public safety building.

Shortly after his conversation with Carey, Hartshorn and investigator Larry Rollins went to the interview room to talk to the defendant. Defendant requested the presence of a certain police officer he was familiar with and this officer was summoned to the room.

At approximately 6:20 p.m.—one hour and 20 minutes after his arrest—the defendant was advised of his rights by investigators Hartshorn and Rollins. He initialed a written form to indicate he understood his rights and then (according to Hartshorn) agreed to answer questions without the presence of an attorney. Hartshorn and Rollins then questioned the defendant about the Cartwright incident until 8:55 p.m. During this period, however, the questioning was interrupted several times. At 6:58 p.m. it was interrupted until 7:24 p.m. and during this time the defendant was served supper. The interview again halted from 8:21 p.m. until 8:53 p.m. At the end of this break, defendant asked to make a phone call and the officers took him to another room where he called his employer. After this phone call, the defendant was asked if he wanted to make another call and he declined the offer. (The defendant did not ask his employer to contact an attorney but he did ask the officers when he would be taken to court. This question came after defendant was overheard discussing the possibility of bail with his employer. Defendant was told he would be taken to court at 1:30 p.m. on the following day.)

From 9:05 until 11 p.m. defendant was questioned by police officers Robert LeConte and Gene Woodward regarding the shooting death of David Holler which occurred on May 8, 1978. Prior to this interview, defendant was again advised of his rights and he signed another waiver form. At 11 p.m. he was allowed to speak to his mother and stepfather. They were together until 11:50 p.m. when defendant was placed in a cell. The statements which defendant had made to the officers on May 17 were basically exculpatory.

Investigator Rollins testified that at 11 a.m. the following day, May 18, he and Hartshorn went to defendant's cell and asked him if he wanted

to talk with the officers. Defendant agreed, and he was then taken to the interview room where he was once more advised of his *Miranda* rights and again waived them. As was previously done, each paragraph of the form was read to defendant and he was asked if he understood his rights or had any questions. He responded that he understood the form and had no questions. After this procedure was concluded, defendant was questioned about the death of David Holler. Hartshorn and Rollins concluded this questioning at 1 p.m.

The defendant was served lunch and met with his parole officer from 1 until 2 p.m. Defendant testified that the investigators had already told him that his parole had been revoked but they denied this. They testified that during the previous questioning defendant had expressed concern about his parole and they decided to call the parole officer to talk to defendant about this.

From 2 until 2:55 p.m. defendant was in the interview room by himself awaiting the arrival of a polygraph examiner. After a fifth repetition of the *Miranda* warnings and another waiver of these rights by defendant, a polygraph examination was conducted. It concluded at 4 p.m. and Hartshorn and Rollins then questioned defendant until 4:25 p.m. Investigators LeConte and Woodward questioned the defendant from 4:30 until 6:05 p.m. and during this session the defendant, for the first time, admitted knowing—and shooting—David Holler.

At 6:10 p.m. defendant was served dinner and then spoke with his father from 7:30 until 8:10 p.m. Carolyn Burris, an acquaintance defendant had asked to speak with, met with him from 8:30 until about 9 p.m.

Investigators LeConte and Woodward, after again advising defendant of his rights and obtaining a waiver, took a written statement from about 9 until 10:45 p.m. According to this statement, the defendant had seen David Holler on May 7 on a road near Carolyn Burris' home. He later went to Holler's home and, at Holler's insistence, killed him. During this questioning, defendant also drew several sketches of the crime scene. After the questioning was completed, defendant met with his mother until 11:45 p.m.

Each of the individuals who talked to the defendant on May 17 and 18 testified that he did not tell them he had been refused an attorney. Defendant's parents testified that he looked tired and pale and had difficulty speaking.

Defendant is a 26-year-old man and was the assistant manager of a Hills Brothers shoe store at the time of his arrest. He admitted that he had been questioned by police on previous occasions and further testified that when he arrived at the public safety building on May 17 he asked to make a phone call and to be taken to a hospital because he was cut and bruised

from his altercation with Cartwright and chilled from being outside since 5 a.m. May 16. He also testified that he had no sleep since that time. Investigator Hartshorn testified that defendant did not make such requests and, in fact, refused an offer of medical treatment.

Defendant admitted that on May 17 he agreed to talk to the officers about the Cartwright incident. He testified that later that evening he told the officers that he saw no point in talking further with them but they responded that it was necessary to ask him each question 30 times. Defendant denied that the officers allowed him to use the phone to call his employer and stated that he did not recall speaking with his mother or stepfather on May 17.

According to defendant, he gave the police the statement and drew the sketches of the Holler residence because he wanted the questioning to end. He also testified that the police had threatened to continue working on the Holler case and see that defendant was arrested when he was released from prison. The officers denied this. They testified that no promises or threats were made to defendant. Defendant admitted that he did not again request an attorney but explained that this was because he had been told that an attorney could not help him. He agreed to take the polygraph examination only after the officers told him that the questioning would stop if he passed it.

Defendant further testified that on several occasions he expressed a desire to stop the interview but the police persisted. When told that the questioning would stop if he gave a statement, defendant agreed to do so. He could not tolerate returning to prison on a parole violation knowing the State was attempting to convict him on another charge. He did, however, admit that the statement was not forced.

At the conclusion of the suppression hearing, the trial court denied defendant's motion to suppress, ruling that defendant's initial statement to Officer Carey was merely an inquiry or request for information and not a request for counsel. The court found that defendant agreed to talk to the officers and did so knowingly and voluntarily.

Defendant does not argue that this case presents an issue as to the voluntariness of his confession but contends that the police violated his *Miranda* rights by refusing his request for an attorney. He argues that the State failed to show that he subsequently withdrew his request for counsel and therefore his statements were inadmissible because they were the fruits of illegal police conduct.

We disagree.

Whether a defendant's statements to police officers following his arrest were sufficient to constitute a request for counsel has previously been considered by the courts of this State. (*People v. Morrissey* (1977), 49 Ill. App. 3d 622, 364 N.E.2d 454; *People v. Rafac* (1977), 51 Ill. App. 3d

1, 364 N.E.2d 991; *People v. Starling* (1978), 64 Ill. App. 3d 671, 381 N.E.2d 817.) The present case is readily distinguishable from any of the cited cases because here defendant's statement was in the most unambiguous language. The trial court, however, looked to the circumstances surrounding defendant's request (including the numerous other questions propounded to the arresting officer), and concluded that defendant was merely seeking information as to whether he would be allowed an attorney if he so desired. The court did not believe that defendant's statement that "he would like to talk to an attorney" was sufficient to invoke his right to the presence of an attorney during custodial interrogation. See *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.

Contrary to the trial court's ruling, we believe defendant's statement to Officer Carey while en route to the public safety building was sufficient to assert his right to counsel. Here, defendant's statement was more than the mere suggestion that perhaps he should speak to an attorney, which was held to be an insufficient indication of a desire to consult with counsel in *People v. Krueger* (1979), 74 Ill. App. 3d 881, 393 N.E.2d 1283. Defendant's request was in the most unambiguous and unequivocal of terms. And it is not without significance that the arresting officer interpreted the statement as a request for counsel. *Maglio v. Jago* (6th Cir. 1978), 580 F.2d 202.

■ A resolution of whether defendant requested counsel does not, however, terminate our inquiry into the question of whether defendant's confession was properly received in evidence. While some courts apparently hold that the right to the assistance of counsel can never be waived by a suspect whose initial request for an attorney has not been honored (*United States ex rel. Williams v. Twomey* (7th Cir. 1972), 467 F.2d 1248), we believe the question is whether the State has met the "heavy burden" of showing that the defendant knowingly and intelligently waived his right to retained or appointed counsel. *People v. Washington* (1977), 68 Ill. 2d 186, 369 N.E.2d 57, *cert. denied* (1978), 435 U.S. 981, 56 L. Ed. 2d 72, 98 S. Ct. 1631; see also *White v. Finkbeiner* (7th Cir. 1978), 570 F.2d 194 (where the court acknowledged that the State's request to overrule or distinguish *Williams* was an argument not to be lightly dismissed).

The defendant argues that the State failed to meet this heavy burden and that his statements were inadmissible. Because of its ruling that defendant did not request counsel, the trial court did not rule that the defendant had voluntarily retracted his request. Defendant argues that this court should reach that question and rule that defendant did not withdraw the request. The court did rule that defendant agreed to talk to

the officers and did so knowingly and voluntarily. The court therefore found that defendant's action in signing the waiver form presented by the officers and his confession were the result of voluntary and knowing acts. Implicit in that finding is a waiver by the defendant of his right to counsel. And, that decision is not against the manifest weight of the evidence. (*People v. Medina* (1978), 71 Ill. 2d 254, 375 N.E.2d 78.) While testifying at the suppression hearing, defendant admitted that he agreed to talk to the officers on May 17 and further testified that the statement he gave to them on May 18 was not the result of force. His testimony that he gave a statement only to stop the questioning was apparently rejected by the trial court. The evidence shows that subsequent to his request for counsel he agreed to talk to the officers without an attorney being present and he signed four forms which stated that he waived his *Miranda* rights. We believe that this evidence clearly shows that defendant retracted his request for counsel.

The situation presented here is not unlike that presented to our supreme court in *People v. White* (1975), 61 Ill. 2d 288, 335 N.E.2d 457, *cert. denied* (1976), 424 U.S. 970, 47 L. Ed. 2d 738, 96 S. Ct. 1469, where the court ruled that the effect of the procedural violation of *Miranda* was sufficiently dissipated so that the defendant's confession was voluntary and, therefore, properly received in evidence. In *White*, the police failed to furnish the defendant (a borderline retardate) with an attorney on the morning of his arrest on an unrelated offense. He was questioned later that day and also during the morning and afternoon of the following day. On each of these three occasions he was advised of his rights. With respect to the offense involved in the appeal, the defendant was not questioned until the third day and then only after receiving the full *Miranda* warnings. The supreme court affirmed his conviction because the effect of failing to provide him with counsel on the morning of his arrest was sufficiently dissipated by the time of his confession during the morning of the second day following the arrest. Among the factors discussed by the court in *White* were the lapse of time between the violation and the confession, the repeated admonitions, the fact it was not the first time the defendant had been charged with a crime, and that the subsequent waiver of the right to counsel occurred during questioning about an offense unrelated to the offense for which the defendant invoked the right.

Similarly, here defendant was advised of his rights six times and signed four different written waivers of those rights between the time of his arrest at approximately 5 p.m. on May 17 and his confession which was obtained sometime after 4:30 p.m. on May 18. While repeated admonitions alone will not always break the causal connection between the illegality and the confession (*White*), such factor is not to be

disregarded. Not only did defendant sign the four waiver forms but, according to investigator Hartshorn's testimony, defendant agreed to answer the officer's questions without an attorney being present.

Other factors affecting the admissibility of defendant's confession include the passage of nearly 24 hours between the violation of *Miranda* and the statement sought to be suppressed. Thus, the interrogation which produced the confession did not immediately follow the request for counsel, and during the interim defendant was allowed numerous breaks, including an 11-hour period where he was allowed to sleep. He was also allowed to meet with his mother, father, stepfather, Carolyn Burris, and his parole officer. According to the police officer's testimony, defendant's request to use the telephone was granted and he declined an offer to make additional calls. (See *People v. Smith* (1969), 108 Ill. App. 2d 172, 246 N.E.2d 689, *cert. denied* (1970), 397 U.S. 1001, 25 L. Ed. 2d 412, 90 S. Ct. 1150.) We also note that, unlike the defendant who was a borderline retardate in *White*, this defendant was 26 years old, had a high school education, and was the assistant manager of a Hills Brothers shoe store. At the time of his arrest he was on parole and certainly no stranger to the criminal justice system. He admitted that he had been questioned by police officers prior to this incident.

Furthermore, an examination of the circumstances surrounding defendant's request for counsel shows that it was made at a time when defendant was expressing concern about an offense different from the offense involved in this appeal. Under the circumstances of this case, and contrary to defendant's assertions, we believe that the record clearly shows that defendant knowingly and voluntarily withdrew his request for counsel. Additionally, we conclude that the effect of the procedural violation of *Miranda* was sufficiently dissipated so that defendant's statements were voluntary and properly admitted.

### THE TRIAL

The State attempted to show defendant's motive for taking the life of David Holler by presenting evidence that for some time prior to the death of Holler the defendant had attempted to develop a close personal relationship with Carolyn Burris. The defendant had visited her home on several occasions and as he was concluding one of these visits he suddenly kissed Ms. Burris. The following day Ms. Burris went to the shoe store where defendant was employed to tell him that she did not want to become romantically involved. Defendant put his arm around her and she told him that she had a boyfriend whom she did not want to lose.

Burris' statements to the defendant did not halt his visits to her home, and on May 6 he unexpectedly arrived there at about 10:30 p.m. Burris, who had been asleep, told defendant that she had to get up early the next

day and that he should not come by her house unless he first telephoned her.

On Sunday, May 7, the victim (David Holler) visited Burris at her place of employment to return some materials he had borrowed. He accepted an invitation to her home where he played chess with her children, ate supper, and left at about 11 p.m.

David Holler died between 3 and 7 a.m. on May 8, 1978, from gunshot wounds to his head. His body was discovered in the kitchen of his home by his parents on the same date. A note signed "Debbie" was also found in the kitchen on a table. It had been left at Holler's residence on May 7 by Debbie Jones, a classmate of Holler's at a local junior college. She had stopped by Holler's home to return some items and when she discovered he was not at home she left the note.

Carolyn Burris learned of Holler's death on May 8 at about 5 p.m. The following day, after she talked to police, she called defendant to tell him that he would probably be questioned by them. Over defense objection, Burris testified that she received a phone call from defendant on May 15. In the ensuing conversation, defendant told her that he had been questioned by police and that Burris was under investigation for murder. She also testified that the defendant told her that he would see that she did not go to jail.

Defendant testified that he told Burris that the police had no suspects and that he did not tell her the police had a good case of murder against her. He admitted that he told her that if she was in trouble, he would do whatever he could.

Testimony was also presented, over defense objection, which indicated that subsequent to Holler's murder defendant called Carolyn Burris' former husband. During the brief conversation, defendant mentioned the name "Debbie" to the former husband. Defendant later testified that he was referring to Carolyn Burris' youngest daughter.

Defendant now contends the trial court erred in admitting evidence of the phone calls which he made to Carolyn Burris and to her former husband. He argued that these phone calls were not relevant because they had no probative value. If they had any probative value, he contends it was outweighed by the prejudicial effect. Defendant claims that his credibility was an essential factor in his defense because he needed to convince the jury that his confession was false. During the phone call to Carolyn Burris, he allegedly made statements which were not supported by other evidence in the record and, defendant argues, the jury may have concluded that he lied when he told Burris that the police suspected her of committing the murder. In addition, defendant and Burris gave conflicting testimony concerning the content of this call and again defendant argues his credibility was adversely affected.

■ ■ We disagree with defendant's contentions. His phone call to Carolyn Burris was relevant (as the State contends) because it tends to support the State's theory that the motive for defendant's conduct was a desire to develop a close relationship with Burris and to prevent anyone else from developing such a relationship. Evidence is admissible if it fairly tends to prove the offense charged. Any circumstances may be put into evidence which tend to make the proposition at issue either more or less probable. (*People v. Galloway* (1963), 28 Ill. 2d 355, 192 N.E.2d 370, *cert. denied* (1964), 376 U.S. 910, 11 L. Ed. 2d 608, 84 S. Ct. 665.) The only evidence to connect the defendant to David Holler was Carolyn Burris. Certainly evidence which tended to show defendant's attempts to ingratiate himself with Burris was relevant to show that he may have experienced hostility toward the man who stayed at her home until 11 p.m. on the day preceding his death. This testimony was not inadmissible simply because it may also have had a tendency to prejudice the defendant. *People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658.

■ The evidence concerning defendant's reference to "Debbie" in his phone conversation with Burris' former husband was offered by the State to establish defendant's presence at Holler's residence at the time of the shooting. While defendant's reference to "Debbie" did not conclusively prove his awareness of the note found at Holler's residence, the testimony was circumstantial evidence of defendant's presence at the scene and as such properly admissible. That defendant attempted to explain this as a reference to Burris' daughter did not bar admission of this evidence.

Finally, in his brief defendant argued that imposition of a consecutive sentence was error because the trial court's act in not imposing an extended term of imprisonment was tantamount to a conclusion that consecutive sentencing was not required to protect the public from further criminal conduct by the defendant. (*People v. Dawson* (1975), 30 Ill. App. 3d 147, 332 N.E.2d 58.) During oral argument, however, defendant properly withdrew this argument on the basis of our supreme court's opinion in *People v. Snyder* (1979), 77 Ill. 2d 459, 397 N.E.2d 799.

Affirmed.

CRAVEN and WEBBER, JJ., concur.