THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. JOSE MEDINA, Defendant-Appellee.

First District (3rd Division) No. 60727

Opinion filed April 15, 1976.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Ferdinand M. Minelli, and John T. Theis, Assistant State's Attorneys, of counsel), for the People.

Albert J. Armonda, of Chicago, for appellee.

Mr. PRESIDING JUSTICE MEJDA delivered the opinion of the court:

This is an appeal by the State from an order suppressing an oral and a written statement of defendant, Jose Medina, pursuant to Supreme Court Rule 604(a) (Ill. Rev. Stat. 1973, ch. 110A, par. 604(a)). The State on appeal does not challenge the findings of fact made by the trial court, but solely contends that the trial court misapplied the law to its findings in holding that defendant had not intelligently and knowingly waived his constitutional rights prior to his oral and written statements. We affirm. The pertinent facts follow.

On July 29, 1973, defendant, then age 17, was arrested in his apartment by Officers Deloughery and Sherry of the Chicago Police Department. He was later indicted for murder arising out of the shooting of Caesar Jacquez on July 27, 1973. Prior to trial defendant filed a motion to

suppress his oral and written statements given to the police on the day of his arrest. On January 17, 1974, a hearing was held on the motion.

Officer Deloughery testified. On July 29, 1973, he and other police officers went to defendant's apartment at 2453 South Homan Avenue, Chicago, to effect his arrest for the murder of Caesar Jacquez. Defendant lived there with his parents, Egardo and Julie Medina, and his two sisters, Maria and Julia Medina. The police arrived at about 3 a.m., stated their purpose and were admitted into the apartment by Egardo Medina. They went to defendant's bedroom, awakened him and advised that he was under arrest for the murder of Caesar Jacquez. While defendant was dressing, a telephone call was made to the family attorney, Albert Armonda, and Julia handed the telephone to Officer Deloughery. He informed Armonda that the defendant was under arrest for murder, and supplied his own name, assignment and police district. He testified that Armonda did not tell him defendant should not be questioned concerning the charge or that he wished to be present during any questioning; further, that neither defendant nor Armonda asked to confer with the other on the telephone. Deloughery then returned the telephone to Julia and defendant was escorted from the apartment. As they were leaving Julia told defendant that Armonda had said for him to keep quiet.

Officers Deloughery and Sherry then took the defendant to Area 4 Homicide Headquarters where they arrived at approximately 4 a.m., and defendant was placed in an interrogation room. Deloughery advised him, for the first time, of his constitutional rights. Defendant said he had no knowledge of the facts of the case and would make no statements on the advice of his attorney. Thereafter, Deloughery and Sherry refrained from asking him any questions. Deloughery testified that defendant never requested to have his attorney present at any time between his arrest and the time when Deloughery and Sherry went off duty at 8 a.m.

Officer Thomas Sherry testified. As defendant was being escorted from his home after his arrest, his sister called out, "Don't say anything." At the police station defendant was placed in an interrogation room and advised by Deloughery of his constitutional rights. He was asked if he understood his rights and he replied that he did. He then stated that he had no knowledge of the facts of the case and did not want to answer any questions. No further questions were asked. Before going off duty at 8 a.m., Sherry saw Officer Deloughery talking with Officer Thomas O'Connor, but did not hear the substance of the conversation. Sherry stated that the defendant did not ask to talk with an attorney either at his apartment or at the police station.

Officer Thomas O'Connor testified. He had a conversation with Deloughery at about 8 a.m. on July 29, 1973, but Deloughery did not tell him the defendant had said he would make no statement without an

attorney present. Later, O'Connor spoke privately with defendant and told him that several witnesses had given information that it was he who had shot Caesar Jacquez, and that the witnesses would be coming down to view defendant in a showup. Defendant then said, "I didn't do it. Let me tell you what happened. I just drove the car." O'Connor stated that he stopped defendant at that point and advised him he had a right to remain silent, and that whatever he said would be testified to in court. Defendant responded, "I know all that. I drove the car and Tingo did the shooting." O'Connor then asked defendant if he would make a written statement, and he agreed. O'Connor typed defendant's statement in question and answer form, and again advised him of his right to remain silent and his other constitutional rights which defendant said he understood. O'Connor repeated the constitutional warnings in the body of the written statement and defendant's dictated response that he knew his rights and desired to tell what he knew of the shooting of Caesar Jacquez. When he finished typing the statement defendant read it, made a correction in his own handwriting, and signed the bottom of each page. O'Connor stated that later in the day defendant spoke to an assistant State's Attorney and admitted that the written statement had been freely and voluntarily made. When asked if he make another statement in the presence of a court reporter, defendant replied that he had already given a voluntary statement and did not know what else he could say. O'Connor stated that defendant never requested to see or telephone an attorney, never refused to make the original statement, and never attempted to invoke his constitutional rights.

After testimony by members of defendant's family concerning the circumstances of his arrest, the defendant testified. Upon arriving at the police station he was questioned while handcuffed. He first told Officer Deloughery that he knew nothing of the case, and repeatedly told the officers that he would say nothing more without conferring with his attorney. Following several more hours of attempted questioning by the police, an officer named O'Connor entered the room and told defendant that several witnesses were coming down who would "finger" him and that if he remained silent while they were pointing him out he would be making an admission. He then told defendant that an individual named "Tingo" and two others, all of whom were implicated in the shooting, had already signed statements. O'Connor showed the statements to defendant and said that if he would sign a statement that Tingo did the shooting he could go home. Defendant agreed. O'Connor brought a typewriter into the room and typed the defendant's statement. When it was completed defendant said he could not read well and needed his glasses. O'Connor told him not to worry about that. After initialing corrections, defendant signed the statement. A short time later an assistant State's

attorney came in and asked defendant to answer a few more questions. Defendant stated that he felt he had been tricked into making the statement and therefore refused to answer any further questions. He denied that the police had ever informed him of his constitutional rights.

Paul Kayman, an assistant State's attorney, testified in rebuttal that he spoke with defendant at Area 4 Homicide Headquarters at about 10 a.m. on July 29, 1973; that defendant identified his written statement and acknowledged that he had been advised of his constitutional rights. Alice Tyrrell, an employee of the Chicago Board of Education, testified that the defendant had an I.Q. rating of 117 in 1969, and that he was reading at the 10th grade level when he was in the 9th grade.

Following argument, the trial court made certain findings of fact. The findings included, *inter alia*, that defendant had been advised of his constitutional rights and had indicated a desire to make no statements without the presence of an attorney; further, that there was insufficient evidence to establish that the subsequent statements of defendant were preceded by an intelligent and knowing waiver of his previously invoked right to silent and to consult with an attorney before any questioning. After stating that an effective waiver cannot be presumed from either the fact that an accused was silent after being advised of his rights or that a statement was in fact subsequently obtained, the trial court ordered defendant's oral and written statements suppressed.

The State does not challenge the findings of fact made by the trial court, but argues instead that the court misapplied the law to the facts. The State contends that defendant, in signing a written waiver of his constitutional rights at a time when he was aware of those rights, made an effective waiver, notwithstanding that he had previously indicated a desire not to make a statement without an attorney being present. We disagree.

■■ In the filing of the motion to suppress, the burden was placed upon the State to establish by a preponderance of the evidence that defendant was advised of his constitutional rights and knowingly and intelligently waived them. (*People v. Burbank* (1972), 53 Ill. 2d 261, 291 N.E.2d 161, *cert. denied*, 412 U.S. 951, 37 L. Ed. 2d 1004, 93 S. Ct. 3017; *People v. Johnson* (1969), 112 Ill. App. 2d 148, 251 N.E.2d 393.) In the instant case, the determination of whether the State had met that burden was for the trial court, and its findings of fact will not be disturbed on review unless contrary to the manifest weight of the evidence. *People v. McDonald* (1973), 15 Ill. App. 3d 620, 305 N.E.2d 69.

At the hearing on the motion, Officers Deloughery and Sherry testified that following defendant's arrest his sister Julia told him to keep silent. Deloughery testified that Julia told defendant that the attorney, Albert Armonda, had advised over the telephone that defendant should keep

quiet. Deloughery and Sherry testified that defendant refused to answer any questions after he was first advised of his rights in the police interrogation room. Deloughery further stated, however, that defendant said he would answer no questions on the advice of his attorney.

Office O'Connor testified that when he resumed questioning defendant after 8 a.m. on July 29, he was unaware that defendant had previously refused to answer any questions on the advice of counsel. Defendant made his first oral statement after O'Connor told him that identifying witnesses were coming to the station to view him in a showup. He then said he did not do the actual shooting of Caesar Jacquez, but merely drove the automobile. O'Connor testified that he warned defendant at that point that he could remain silent and that whatever he did say would be testified to in court. Defendant repeated his earlier statement, adding that an individual named Tingo had shot Jacquez. O'Connor testified that defendant then agreed to make a written statement; he orally gave defendant a full admonishment of his rights; and he incorporated those warnings into the body of the written statement which defendant signed. At the conclusion of the hearing the trial court found that defendant had been properly advised of his rights; that he had, however, manifested a desire to consult with an attorney; and at the time his oral and written statements were made he had not made an effective waiver of his right to confer with an attorney prior to any questioning. The evidence in the record demonstrates that the findings of the trial court, including that as to the absence of an effective waiver, were not contrary to the manifest weight of the evidence. Moreover, the trial court did not misapply the law to its findings of fact in ordering the suppression of the statements.

■■ ■ In *People v. Turner* (1973), 56 Ill. 2d 201, 306 N.E.2d 27, it was stated in pertinent part, at pages 205, 206 and 207:

> "In *Johnson v. Zerbst*, 304 U.S. 458, 464, 82 L. Ed. 1461, 1466, 58 S. Ct. 1019, the Supreme Court said: 'A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'
>
> \* \* \*
>
> "\* \* \* In *Miranda*, the Supreme Court after stating that a defendant could voluntarily, knowingly and intelligently waive his rights said: 'If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not

wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.' 384 U.S. at 444-45, 16 L. Ed. 2d at 707, 86 S. Ct. at 1612.

In *People v. Henenberg*, 55 Ill. 2d 5, 11, we quoted with approval from *United States v. Blair*, 470 F.2d 331, the statement that the language of *Miranda* 'could hardly have been more uncompromising' that if the accused 'indicates in any manner and at any stage of the process that he wishes to speak with an attorney before speaking there can be no questioning,' and that if he states that he wants an attorney 'the interrogation must cease until an attorney is present.' "

Here, the record supports the findings of the trial court that defendant initially indicated a desire to confer with an attorney prior to questioning, and that his interrogation was improperly, although unwittingly, resumed by Officer O'Connor. Under the holding in *People v. Blanchard* (1967), 37 Ill. 2d 69, 224 N.E.2d 813, knowledge that defendant had previously invoked his right to consult with an attorney must be imputed to O'Connor. (Also see *People v. White* (1975), 61 Ill. 2d 288, 335 N.E.2d 457.) Therefore, defendant's first oral statement was secured by O'Connor in violation of defendant's *Miranda* rights. The subsequent oral and written statements of defendant were contemporaneous in time and place with the original oral statement and were presumptively tainted by its illegality. (*People v. Taylor* (1965), 33 Ill. 2d 417, 211 N.E.2d 673; *People v. Schutz* (1972), 8 Ill. App. 3d 827, 291 N.E.2d 194.) On such showing of improper police conduct, the obligation falls upon the State to prove that the connection between the improper conduct and any statement or confession sought to be admitted at trial is so attenuated as to dissipate the taint. (*People v. Landgham* (1970), 122 Ill. App. 2d 9, 257 N.E.2d 484, *cert. denied*, 402 U.S. 911, 28 L. Ed. 2d 652, 91 S. Ct. 1389.) In the instant case the record does not establish sufficient attenuation between defendant's statements and the violation of his right to consult with an attorney prior to questioning to render the statements admissible at trial.

In arguing that sufficient attenuation was demonstrated, the State cites the recent case of *People v. White*, where the defendant was advised of his rights after his arrest on an unrelated offense. He requested an attorney, but one was not provided. Over the next three days defendant was periodically interrogated concerning a series of unrelated offenses, and confessed to the commission of two of them. Before each period of questioning he was advised of his rights, and said that he understood

them. On the third day of custody defendant was again advised of his rights and questioned concerning a murder. He signed a written confession to the murder which was later admitted into evidence at his trial on that charge over the objection that it had been secured in violation of his *Miranda* rights. On appeal, the Supreme Court held that the confession was properly admitted. While stating that the case was a close one, the court held that the effect of the procedural violation of the *Miranda* standards was sufficiently dissipated by a lapse of time, repeated constitutional admonitions, and other intervening events as to render it of a voluntary character.

■■ In the instant case, defendant was 17 years of age. There is nothing to indicate that he had previously been arrested or advised of his *Miranda* rights, a factor considered significant in *White*. Neither did defendant's statements come after three days of repeated constitutional warnings and questioning on unrelated offenses as in *White*. Instead, his original oral statement followed shortly after Officer O'Connor improperly resumed questioning him on the specific charge for which he had been arrested some four hours earlier. Defendant's second oral statement came after an incomplete *Miranda* warning by O'Connor. The written statement which followed merely embellished what defendant had just briefly before stated orally. The *White* case is clearly distinguishable from the instant case.

The other cases submitted by the State in support of the contention that an effective waiver was made have been fully reviewed. However, they are clearly distinguishable. In none of them did the accused manifest a desire to consult with an attorney prior to interrogation as in the instant case.

For the foregoing reasons, the order of the circuit court of Cook County suppressing the oral and written statements of the defendant is affirmed.

Affirmed.

DEMPSEY and McNAMARA, JJ., concur.