THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WALTER WASHINGTON, JR., Defendant-Appellant.

Second District (2nd Division)   No. 75-166

Opinion filed August 26, 1976.

Ralph Ruebner and Peter B. Nolte, both of State Appellate Defender's Office, of Elgin, for appellant.

Philip G. Reinhard, State's Attorney, of Rockford (Edward N. Morris and Christine M. Drucker, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

The defendant, Walter Washington, Jr., was convicted by jury verdict of armed robbery and murder. He contends that (1) certain statements he made while in custody at Rockford Police Headquarters, after he had requested an attorney, should not have been admitted into evidence, (2) the trial court abused its discretion in denying defendant's motion to exclude at trial his record of a 1965 conviction for burglary, and (3) certain evidence was improperly obtained by the police in an automobile, and therefore should not have been admitted into evidence. (His third contention was raised in defendant's supplemental *pro se* brief filed by leave of court.)

On March 22, 1974, at about 8:50 p.m. Mrs. Kappa Sharp, a cashier at the Pacemaker Grocery Store in Rockford, was busy preparing for closing at 9 p.m. A man with a gun came up behind her and told her to open the cash register. She started to scream and he told her if she did he would kill her. She opened the register at his direction and he removed therefrom the five and ten dollar bills ($1270). She described the robber as a Negro who wore a plaid woman's cape with a hood, and a ski mask over his face; the weapon held by him was a silver revolver. Mrs. Sharp pressed a buzzer which caused the store owner, Mr. Zagnoni, and two stock boys, Henry Gregg, Jr., age 14, and Michael Cook, age 17, who were stacking milk cases in the back, to come to her. Mrs. Sharp told them of the robbery and the two boys ran out the front "OUT" door in pursuit. They then picked up a set of running footprints in the fresh-fallen snow and followed them a short distance to the vicinity of a garage. Henry was about 10 feet in front of Michael and about 25 feet from the corner of a garage when Michael saw the barrel of a gun from behind the corner of the garage. Michael's warning to Henry to "duck" came too late when the robber fired a shot, which struck Henry in the head, causing his death. The robber pointed the weapon at Michael but fled, jumping a fence into an adjacent alley. By that time police arrived on the scene and Police Officer Emigholtz followed a single set of tracks in the snow to another garage. After receiving reinforcements he entered and found defendant "crouching" in a corner with what turned out to be the murder weapon and with the robbery proceeds lying on the floor at the defendant's feet.

It was then about 9 p.m. Officer Emigholtz arrested the defendant and advised him of his "rights" (under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602). Defendant was "cuffed," led into a squad car where officer Murphy advised defendant of his rights; defendant stated he understood them. In response to a question he told Officer Murphy that he was with another person in a 1963 or 1964 white Mercury. At the police station Detective Cronk advised the defendant of his rights by handing him a rights' waiver form, which listed his rights in detail followed by a "waiver of rights." Defendant read the form aloud, said he understood his rights and signed the form using the name "William Brown," the name he had given the police. The defendant then made an oral statement in some detail in the presence of Detective Cronk and Officers Emigholtz and Murphy. The substance of the statement was that he saw a fellow named Jerry Wilson at the Bee Hive Club at about 7:30 p.m. and defendant had a couple of drinks there; they left together, got into Wilson's 1964 or 1965 white Mercury; Wilson then drove to Kishwaukee Street, drove down it, then turned left about a block, then turned right, and parked; Wilson got out of the car and told defendant he was going to see a friend; the defendant stayed in the car about 15 minutes and then got out and started walking down the street; Wilson then came up to him and handed him a gun and a large amount of money; the defendant then saw many police cars in the area and started to run through yards, jumped a fence, ran until he saw a garage was open, went inside and hid in a corner until the police arrived and took him into custody.

When Detective Salamone came into the interrogation room defendant was asked to repeat his statement. He did so but this time stated that after he got the gun and money Wilson ran into the garage with him, stayed awhile and then left. When Detective Palmeri came into the room the defendant repeated this statement.

Defendant was then photographed, given a neutron activation test and placed in a lineup. At about 1 a.m. he was brought back to the interrogation room. The officers talked to the defendant about the lineup and defendant's involvement in the crime, and defendant stated that he did not wish to talk to them anymore. He was then taken to the booking room and when asked if he wished to make a telephone call said he did not wish to do so. There was no further interrogation of the defendant until the following morning and, defendant not having indicated a desire to consult with a lawyer, there is no claim that the procedures followed to that point did not fully comply with the strictures of the *Miranda* opinion.

At about 9:30 a.m. on March 23 Detective Bland and Officer Fagin brought the defendant from his cell to an office in the Detective Bureau for resumption of interrogation. Officer Fagin advised the defendant of

his rights again. The defendant said he understood them, was willing to talk, and to sign the rights' waiver form which he did. Shortly after the officers began to speak with the defendant he stated he wanted a public defender. Detective Bland told him "they could not give it to him, that it would be determined by the court whether he could have a public defender." He told defendant the name of the public defender—Craig Peterson—and gave him the telephone book. The defendant looked up the number, dialed, but received no answer. Officer Fagin asked him if he still wanted to talk to the officers about the case, not having talked to an attorney, and the defendant said "Yes," that he wanted to get the truth out but first wanted to talk to his mother. He dialed a number but the line was busy. He then dialed again and had a conversation which the officer later learned was with his "girl friend," Delores Fair.

The officers later learned that the latter conversation was tape recorded. When they learned about it they took the defendant to the radio room where they had the tape recording played twice for the defendant. (The transcript of the hearing on defendant's motion to suppress shows that that conversation began at 9:44 a.m. and recites: "The tape recorded conversation was then played for the court but because of the unintelligible nature of a lot of it, was not recorded or transcribed." At the conclusion of that hearing the trial court suppressed those tape recordings, and on motion *in limine*, by defendant's counsel, Mr. Peterson, the trial court barred at trial any testimony or any reference in any manner to that telephone conversation with Ms. Fair.)

The officers then took the defendant back to the office and questioned him until about 1:10 p.m. The defendant tried again to reach the public defender by telephone but received no answer. Defendant was then returned to his cell. (None of the statements made by the defendant during the period from 9:30 a.m. to 1:10 p.m. were introduced at trial.) There was no evidence of further questioning of the defendant during the ensuing period until about 5:30 p.m.

At about 5:30 p.m. on March 23 defendant wanted to talk to "some detective." Detectives Cronk and Gessner responded and brought the defendant to the office. Detective Gessner warned defendant of his rights by reading the rights' waiver form to him. The defendant responded that he understood his rights, having been advised before. Detective Gessner then had him sign the rights' waiver form. Defendant told them that he didn't wish to make a statement, and that he did want to speak to a priest and a psychiatrist. Detective Gessner told defendant that they could probably get a priest for him that evening but he would not be able to have a psychiatrist until he got to the county jail. The defendant was then allowed to call his mother and spoke to her. After this telephone conversation Detective Gessner asked the defendant how he felt and

defendant replied that he "felt real bad about the dead boy, his family, and also his own family." In response to further questions by Detective Gessner defendant answered that he was alone when he left Freeport and so remained "all night long." When asked whose car he had the night of the robbery he replied that he wanted to talk but wanted more time to think about it. The defendant was then returned to his cell.

At about 8 p.m. Detectives Gessner and Cronk brought the defendant from his cell in order that he could talk to Father Wentig, the police chaplain. After that private conversation which lasted about 45 minutes the officers spoke again with the defendant for about 5 or 10 minutes. They asked him if it was necessary to advise him of his rights. The defendant said he understood them. He then told them, in response to Detective Gessner's question, that he had been involved in one other robbery and volunteered that he "got nothing out of" the first robbery, that that was the reason he "pulled the second one," and that he wanted to tell the officers about it because he did not want an innocent person going to jail. To another question about the other robbery, defendant finally responded that he had better talk to an attorney. Detective Cronk "looked up" Mr. Peterson's residence telephone number, the call was placed and defendant conversed with him. No subsequent statements of defendant were offered in evidence by the State.

The defendant contends that all statements made by him after he requested an attorney about 9:30 a.m. on March 23 should have been suppressed, and that the admission into evidence of those statements violated his Fifth Amendment privilege against self-incrimination under the doctrine of the *Miranda* decision. We agree.

The procedures to be followed if the person in custody asks to consult with a lawyer are detailed in the *Miranda* opinion as follows:

> "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. * * *
>
> * * * If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege so long as they do not question him during that time." 384 U.S. 436, 474, 16 L. Ed. 2d 694, 723-24.

Earlier in that opinion the court said:

> "The mere fact that he [the defendant] may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." 384 U.S. 436, 445, 16 L. Ed. 2d 694, 707.

In the case at bar, while the statements made by the defendant between

9:30 a.m. and about 1:10 p.m. were not introduced at trial, the statements he made after 5:30 p.m. on March 23, which were, should have been suppressed. During that questioning the defendant stated he had been involved in another robbery and that he "felt bad about the dead boy * * *."

It is true, as the State emphasizes, that the defendant was specifically advised of his *Miranda* rights on five different occasions and signed written waivers of those rights on three of them. The State relies on *People v. White* (1975), 61 Ill. 2d 288, in which the Illinois Supreme Court concluded that a confession was voluntary even though the defendant confessed after having been questioned subsequent to defendant's request to see a lawyer. However, in *White* the subsequent interrogations resulting in a confession after a lapse of 36 hours subsequent to his request to speak to an attorney, were with respect to unrelated offenses, and there was an 8-hour lapse between the time the defendant initially requested an attorney and tried to reach him and the time he made his first admission.

In *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321, the defendant who had been arrested on robbery charges, was given the *Miranda* warnings, and the detective immediately ceased interrogation when defendant stated he did not want to discuss the robberies, and did not try to resume questioning. After an interval of more than 2 hours and again admonishing the defendant of his *Miranda* rights another detective questioned defendant solely about an unrelated murder, and defendant then made an incriminating statement. The United States Supreme Court, after considering several possible interpretations of the *Miranda* case, concluded that under such circumstances the defendant's right to cut off questioning about the robberies was "scrupulously honored," and that subsequent questioning about an *unrelated* homicide was consistent with a reasonable interpretation of his earlier refusal to answer questions about the robberies. In doing so, the court said:

> "This is not a case * * * where the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." 423 U.S. 96, ___, 46 L. Ed. 2d 313, 322, 96 S. Ct. 321, 327.

■■ In the case at bar, while the police officers provided a "fresh set of warnings" after the defendant requested counsel, they resumed

interrogation with respect to the same crimes which had been the subject of the earlier interrogation. The defendant's right to cut off questioning was therefore not "scrupulously honored" and the statements made by defendant after he requested counsel should have been suppressed and were inadmissible. See *People v. Parnell* (1975), 31 Ill. App. 3d 627, 630.

The State argues that even if the statements introduced as evidence against the defendant at trial were inadmissible, their use as evidence in this case was harmless error and does not require reversal. We have examined the evidence and note that the circumstantial evidence of defendant's guilt of both offenses is very impressive. However, we are unable to say that it is so overwhelming as to enable us to determine beyond a reasonable doubt that the error did not contribute to the jury's guilty verdict. See *People v. Wilson* (1975), 60 Ill. 2d 235, 242.

In view of our holding no purpose would be served in considering defendant's second contention for the reason that in a new trial evidence of defendant's 1965 conviction may become inadmissible for impeachment under the holding of the Illinois Supreme Court in *People v. Montgomery* (1971), 47 Ill. 2d 510, which adopted the substance of Rule 609 of the Federal Rules of Evidence as the rule of law in Illinois.

We now consider the defendant's third contention. He argues that certain evidence obtained from an automobile near the scene of the crime at about 10 a.m. on March 23 should have been suppressed because (1) it was the fruit of an unlawful taping of defendant's telephone conversation with Ms. Fair, (2) the seizure occurred at a time too remote to have been incident to the arrest, and (3) there were no exigent circumstances to justify a warrantless search and seizure. While the defendant may be precluded from raising this issue on review by failure to present it to the trial court, our remandment of this case for a new trial requires a statement of our views on this question. The record discloses that defendant's telephone conversation with Ms. Fair began at 9:44 a.m. It does not disclose the contents of that conversation or that the defendant revealed therein to Ms. Fair the location of her vehicle (which was near the scene of the crime). While that conversation was recorded on tape and played twice at the hearing on the motion to suppress the transcript recites that "because of the unintelligible nature of a lot of it" it "was not recorded or transcribed." The trial court suppressed it at the conclusion of the hearing on defendant's motion and later granted defendant's motion *in limine* barring at trial any testimony or reference thereto in any manner.

Moreover, the testimony at trial was that the police were at the location of the automobile in question by 10 a.m. on March 23. The ignition keys were inserted in the ignition lock and were visible. The car doors were unlocked. Inside the car the police found defendant's white boots and

a billfold containing a driver's license belonging to defendant in an envelope bearing the name of "Andrew Washington" and the police removed from the gear shift knob of that car a latent fingerprint which was identified as that of the defendant.

■■ The automobile in question was the property of Ms. Fair, the defendant's girl friend. The defendant, therefore, did not have a "proprietary or possessory interest in the car" and is not in a position to challenge the legality of the search on that basis. (*People v. Henenberg* (1973), 55 Ill. 2d 5, 13.) The fact that the keys were in the car and the possibility that defendant's friends or family might remove it provided exigent circumstances for the police to enter the car and seize the evidence without a warrant. In *Cardwell v. Lewis* (1974), 417 U.S. 583, 595, 41 L. Ed. 2d 325, 338, 94 S. Ct. 2464, 2472, where the defendant had been arrested and after interrogation an awareness arose that his car constituted incriminating evidence, the Supreme Court observed that because of that, "the incentive and potential for the car's removal substantially increased." The court stated:

"Exigent circumstances with regard to vehicles are not limited to situations where probable cause is unforeseeable and arises only at the time of arrest. *Cf.* Chambers [v. Maroney, 399 US 42, 50-51, 26 L. Ed. 2d 419, 427-28, 90 S. Ct. 1975]. The exigency may arise at any time, and the fact that the police might have obtained a warrant earlier does not negate the possibility of a current situation's necessitating prompt police action."

For the reasons stated in this opinion the judgment of the circuit court of Winnebago County is reversed and the cause is remanded for a new trial.

Reversed and remanded.

T. J. MORAN, P. J., and DIXON, J., concur.