THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ALEX HOLMES, Defendant-Appellant.

Fourth District   No. 14423

Opinion filed October 28, 1977.

Richard J. Wilson and Jeffrey D. Foust, both of State Appellate Defender's Office, of Springfield, for appellant.

Patrick M. Walsh, State's Attorney, of Decatur, for the People.

Mr. JUSTICE MILLS delivered the opinion of the court:

This is a *Miranda* case.

Were the strictures of *Miranda* violated?

Yes.

We must reverse and remand.

In the early morning hours of October 24, 1976, the defendant (Holmes), the victim (Jones), and several other persons were present at the home of Josie Wilder who ran a gaming house each weekend. At one point in the evening—although no one could remember the exact time—defendant and the victim got into a fight in the Wilder backyard. They were separated and at some point thereafter each left the party. The

victim was the only white person present. There was testimony that the partygoers were semi-intoxicated on either alcohol, marijuana or both. In fact, the victim admitted he had consumed six cans of beer and some marijuana.

On his way home, the victim (Jones) was accosted by the defendant (Holmes), pistol whipped and further physically abused, commanded to strip, to throw his clothes over a fence and to run away. But before having Jones throw his clothes away, the defendant took from Jones' pants pocket the keys to the service station where Jones was employed and the combination to the safe located at the station. Jones ran to a nearby house where the occupants summoned the police and gave the victim something to wear.

At the police station following his arrest, the defendant was given the *Miranda* warnings by Officers Studebaker and Moore. This was at 10 a.m. on the same day. After the *Miranda* rights were read by the officers, Holmes refused to sign the form acknowledging he had been given the warnings. One officer said that defendant failed to answer when asked if he understood the warnings, but the other officer testified that Holmes indicated that he understood them. However, defendant then talked to the officers and asked questions about the charges against him. After telling him about the charges, the officers asked defendant if he had been at the Wilder's house the night before—to which Holmes said no, claiming he was at the VFW and if he was in any fight, it was there and not at Wilder's. Then he said he would answer no more questions. He was then returned to his cell in the jail.

Some 10½ hours later—at about 8:30 p.m. that evening—defendant was again questioned by different police officers, this time by Officers Hannon and Pittinger. Again the *Miranda* warnings were given and this time defendant said he understood them, but refused to sign the acknowledgement. The officers inquired if he wished to talk, and he responded with a question as to the charges against him. This query was answered and the officers then asked if he had been to the Josie Wilder house the night before. He said that he had not.

The record is clear that upon both in-custody occasions the complete and entire *Miranda* advice was read to defendant. Holmes testified at the hearing on the motion to suppress his statements that he twice asked for an attorney during the morning interview. But Officers Studebaker and Moore did not so testify, although no questions on this point were asked of them on either direct or cross-examination. Following defendant's testimony at the suppression hearing, the police officers were not called for rebuttal evidence on this question. The trial judge who presided at the suppression hearing (a different jurist than the one who presided at the subsequent jury trial) recited on the record at the conclusion of the

hearing that " * * * it is undisputed that the defendant asserted his right, by the People's evidence, that he would not sign the waiver and didn't want to pursue the first interrogation; and by the Defendant's testimony that he demanded an attorney before he would sign People's Exhibit 1. Any question on that? (No response.)" To this statement by the judge presiding, there was no objection, no question, no request for clarification of this statement, no response of any kind by the State's Attorney. Subsequently, the court entered a written order denying the motion to suppress, in which the following findings were made:

"3. It is undisputed that after he was advised of his rights, the defendant asserted certain rights, such as, he would sign no written waiver *and that he would not talk without his attorney.*

4. *It is undisputed that after he said he wouldn't sign or talk without an attorney,* that the conversation between the defendant and the authorities continued, wherein the defendant asked questions as to the offense and why he was charged.

* * *

6. It is without question that the *defendant made no questions* [*sic*] *or admissions of guilt, but only* in discussing the offense and the charges, *made exculpatory statements as to his whereabouts on the night of the occurrence.*

The court finds the defendant was advised of his rights and has reason to believe that he understood the same. The court finds *no basis to Suppress the exculpatory statements.*

The motion is denied." (Emphasis ours.)

Holmes went to trial and his statements about not being "on Orchard Street that evening," asking "if he had been picked up for beating someone" and saying he "couldn't remember" were testified to by Officer Studebaker on direct examination in the State's case in chief. Later, in rebuttal, the State produced evidence of Holmes' statements about being at the VFW and knowing nothing of any fight following defendant's own defense testimony on the stand that he was present at the Wilder's home and got into a fight with Jones at that time. The jury was out approximately 11 hours, were given a *Prim* instruction and then within an hour brought in a verdict of guilty on all charges of armed robbery, robbery and aggravated battery. Judgment on the robbery conviction was vacated because it was a lesser included offense of armed robbery and the defendant was sentenced to concurrent terms of 3 1/3 to 10 years for aggravated battery and 8 to 16 years for armed robbery.

On appeal, the defendant argues that (1) the admission into evidence of his in-custody statements violated the demands of *Miranda v. Arizona,* and that (2) the State's Attorney committed reversible error by

commenting during closing argument that defendant failed to tell the jury of his prior felony conviction.

We must reverse on the first issue.

■■ We are confronted with a *fait accompli*. As recited above, the record in this appeal undeniably demonstrates that the defendant at the morning session refused to talk further about the offenses with which he was charged "without an attorney." At that exact moment, *Miranda v. Arizona* was triggered and no further questions concerning the subject crimes should have followed and the fruit of the improper inquiries should have been suppressed.

Both the words and the meaning of *Miranda* are as clear as crystal:
> "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. *If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.* Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." (Emphasis ours.) 384 U.S. 436, 444-45, 16 L. Ed. 2d 694, 707, 86 S. Ct. 1602, 1612.

And a few pages further in the opinion the *Miranda* court proclaimed:
> "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. *If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.* At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." (Emphasis added.) 384 U.S. 436, 473-74, 16 L. Ed. 2d 694, 723, 86 S. Ct. 1602.

This language is simply not susceptible to other interpretation—it is

adamant, it is mandatory, it is unyielding. As the United States Court of Appeals has said, the language of *Miranda* "could hardly have been more uncompromising." *United States v. Blair* (5th Cir. 1972), 470 F.2d 331, 337-38. See also *People v. Henenberg* (1973), 55 Ill. 2d 5, 302 N.E.2d 27, 30.

Here, there was a lapse of some 10 hours between the morning and evening interrogations of Holmes. Unlike the factual situations in *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321, and *People v. White* (1975), 61 Ill. 2d 288, 335 N.E.2d 457—where confessions were obtained by interrogation (following request for counsel) on totally *unrelated* offenses—the question of Holmes, both in the morning and in the evening of the same day, went to the very pith and core of his whereabouts and alibi defense. In the words of *Mosley*, a defendant's right to have all questions concerning the pending charges cease must be "scrupulously honored." Such did not occur in the case before us and the statements made, and the answers given, by defendant subsequent to his voiced desire for an attorney were inadmissible and should have been suppressed. See also *People v. Washington* (1977), 68 Ill. 2d 186, 369 N.E.2d 57; *People v. Morrissey* (1977), 49 Ill. App. 3d 622, 364 N.E.2d 454.

■■ Perhaps the trial court hypothesized a distinction between a necessity under *Miranda* to suppress confessions and admissions to guilt but that such was not required as to exculpatory statements. The record reflects that at the time of ruling upon the motion to suppress, the trial judge said, "We're not dealing with any confession, or any admission made by the defendant, but only were [*sic*] exculpatory statements resulting from the querry [*sic*] as to the offense and the charges." This statement on the record—coupled with the written order denying suppression as cited herein in part—would seem to indicate that the judge felt exculpatory statements (as distinguished from confessions and admissions) are not barred by *Miranda*. We must disagree.

Black's Law Dictionary (4th ed. 1951) affords us the following definitions, with citations:

> "CONFESSION. In criminal law. A voluntary statement made by a person charged with the commission of a crime or misdemeanor, communicated to another person, wherein he acknowledges himself to be guilty of the offense charged, and discloses the circumstances of the act or the share and participation which he had in it.
>
> ADMISSION. * * * An 'admission' as applied in criminal cases is the avowal of a fact or of circumstances from which guilt may be inferred, but only tending to prove the offense charged, and not amounting to a confession of guilt.

EXCULPATORY. Clearing or tending to clear from alleged fault or guilt; excusing."

It appears to us that a confession is virtually a *whole*, a totality, whereas an admission and a statement may only constitute a *part*—that a confession recites the essentials of the elements of an offense, while admissions and statements recite only sufficient facts that will give rise to an inference of guilt.

The distinction was rather succinctly made by the Illinois Supreme Court in *People v. Rogers* (1953), 413 Ill. 554, 564, 110 N.E.2d 201, 206:

"While exculpatory statements merely raising an inference of guilt do not require proof of their voluntary origin before being admitted in evidence, confessions do require such proof, and the distinction between a mere admission and a confession is that the latter contains a statement showing the actual participation or agency while the former includes any statements or conduct from which guilt may be inferred but does not necessarily follow."

See also *People v. Speice* (1961), 23 Ill. 2d 40, 45-46, 177 N.E.2d 233, 236.

Consequently, we contemplate exculpatory statements as being virtually identical to, or synonymous with, admissions, and—like confessions—fall within the pale of *Miranda* protection. To our view, *Miranda* and its progeny provide a protective umbrella for all categories of statements which either confess or admit to guilt *in toto*, or to partial admissions or statements of facts which in turn can create an inference of guilt. And—like the angels on the head of the pin—we are not concerned with how many exculpatory statements or partial admissions are required to amount to a confession. Even a single, solitary utterance of exculpation is protected, is inadmissible, is to be suppressed. The statement of Holmes as to his whereabouts on the night in question should have been barred from the testimony at trial.

■■ However—argues the State—the admission of the statements have merely constituted harmless error under *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824. We cannot accept this argument. The jury in this case was deadlocked after 11 hours of deliberation and came in with a verdict in the 12th hour after receiving a *Prim* instruction. The record before us reflects that although the victim identified the defendant *by name*, since defendant had his credibility damaged by the rebuttal evidence of his exculpatory statements, we do not view the error here as harmless. Holmes gave a reasonable and plausible alibi which did not resemble the story given the police which was related on rebuttal. And, certainly, since the jury was out so long, would be further indication that it did not find the evidence against the defendant to be overwhelming. We conclude that the suppressible

evidence was of such import that its admission at trial was reversible.

Lastly—and very briefly—we dispose of the second and final contention on appeal. We have examined the State's Attorney's closing argument and find that it was nothing more than a proper and legitimate comment on the evidence—reflecting nothing either objectionable or erroneous.

For the reasons given on the first issue, however, the convictions and judgments thereon are reversed and remanded for a new trial.

Reversed and remanded for a new trial.

CRAVEN, P. J., and TRAPP, J., concur.