THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JAMES A. KENNEDY, Defendant-Appellant.

Fourth District No. 14370

Opinion filed June 16, 1978.

948

REARDON, J., dissenting.

Glenn O. Fuller, of Decatur, for appellant.

Patrick M. Walsh, State's Attorney, of Decatur (Thomas W. Gendry, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE GREEN delivered the opinion of the court:

Defendant James A. Kennedy was charged in the circuit court of Macon County with the offenses of rape and deviate sexual assault alleged to have been committed against the same victim on July 30, 1976. At the first trial of the case the jury returned a not guilty verdict on the deviate sexual assault charge and then the jury was discharged after being unable to agree as to a verdict on the rape charge. At a second jury trial he was convicted of rape. Subsequently, a sentence of 14 to 50 years' imprisonment was imposed.

On appeal defendant maintains that the court erred in (1) refusing to suppress statements made by him to police officers while in custody and without either being represented by counsel or having waived right to counsel, (2) admitting into evidence the foregoing statements which were prejudicial to defendant, (3) admitting into evidence testimony concerning the alleged deviate sexual assault of which defendant had been acquitted, and (4) permitting a witness to testify that the alleged victim had told him she had been raped by the defendant. Defendant also argues that his guilt was not proved beyond a reasonable doubt and that the sentence was excessive.

■■ Details of the evidence need not be related. Defendant and the victim were both employees of a religious group. The rape is alleged to have occurred in that group's house of worship in the early afternoon. Although an elderly lady was also then in the building, there were no eyewitnesses. The defendant admits that he made advances to the victim but contends that she consented and that no intercourse occurred. The determination as to whether to believe the victim or the defendant was for the jury. A reasonable jury could have concluded that defendant was proved beyond a reasonable doubt to have raped the victim.

The evidence presented at the hearing on the motion to suppress showed that officers interrogated defendant at the police station where he had been taken into custody, three times: once in the early evening of the

day of the alleged offense and shortly after he was taken into custody, once in the middle of that night, and once the next morning. No evidence of any conversation at the first interview was admitted at trial, a little of the second interview was admitted and more of the third interview was also admitted.

At that hearing, officers Glick and Hannon testified that after explaining to defendant his *Miranda* rights, they presented him a form which set forth separately the elements of those rights. Defendant then initialled lines on the form which appeared at the end of each element. Defendant also wrote in several places on the sheet that he denied the charges and wanted a lawyer. At the bottom of the form appeared a statement that the person signing the form acknowledged having read the form and understanding the rights stated therein. The statement also said the person signing wished to talk to the police. At the side of that statement, defendant wrote: With ATTORNEY PRESENT." Defendant signed the form.

The officers agreed that at the time defendant indicated a desire to talk with them but only with a lawyer present and that he requested the immediate appointment of a lawyer. The officers then informed him that such an appointment could be made only by the court. The two witnesses agreed that defendant then decided to phone a lawyer whom he knew. It turned out that this lawyer was an officer of the defendant's employer. The lawyer was phoned at the religious group's place of worship.

The defendant's testimony at the hearing did not substantially dispute the officers' testimony as to the conversation prior to the phone call except that defendant stated that the form was not executed until after the phone call. The testimony of the conversation after the phone call is sharply in dispute and goes to the heart of the issue raised by the motion. The officers maintain that defendant told them that the lawyer had advised him to go ahead and talk to the police. Defendant says that he told them that the lawyer had told him that he, the lawyer, could not come to the jail at that time but might come later and advised the defendant not to speak to the police. In any event, an interrogation of about one hour's length ensued. The record shows nothing of the substance of the interview other than defendant's statement that he continued to deny any guilt.

Officer Edgar E. Combs and Detective James Dellert testified for the State as to the interrogation held in the middle of the night and the next morning which they respectively conducted. Each testified that defendant made no further demand for a lawyer and explained that he had talked to a lawyer who advised him to go ahead and talk to the police. Defendant, on the other hand, testified that he continually demanded counsel but was refused and did not tell the officers that his lawyer had advised him to talk to them. Defendant also testified that he

had read some law while an inmate of a Federal penitentiary and understood that statements given to police by an accused at a time when an accused had not been offered his right to counsel would be inadmissible. He stated that because of this understanding and because he was getting tired, he made some statements believing that they could not be used against him anyway.

The trial court found that defendant was advised of, understood, and waived his rights and voluntarily made a statement. The evidence was abundant of the advice of rights given by the officers. The defendant did not contend that he did not understand his rights and in fact testified to having studied the law on the subject. The meat of his argument is that once he had demanded counsel, the officers should not have attempted further interrogation. In *People v. Morgan* (1977), 67 Ill. 2d 1, 364 N.E.2d 56, however, the supreme court has recently ruled that although an accused initially refuses to submit to in-custody interrogation without counsel and has been frustrated in his attempt to obtain counsel, further in-custody questioning may be conducted by the police if the accused freely consents. There the accused after being unable to obtain counsel decided to go ahead without a lawyer because one might confuse him.

■■ Here, the trial judge could have believed the officers Glick and Hannon rather than the defendant and determined that the defendant freely decided to permit further interrogation after the phone call to the lawyer. It would be rather unusual for a lawyer to advise an accused to freely talk to law enforcement officers but the trial judge heard the testimony and viewed the witnesses and is in a better position than this court to judge their credibility. Furthermore, regardless of what the lawyer actually told the defendant, if the defendant actually told the officers that he had been advised to go ahead and talk, the officers were justified in considering that statement in determining whether to proceed.

Defendant relies on *People v. Medina* (1976), 37 Ill. App. 3d 1029, 347 N.E.2d 424, *People v. Washington* (1976), 41 Ill. App. 3d 475, 354 N.E.2d 501, and our decision in *People v. Holmes* (1977), 53 Ill. App. 3d 856, 368 N.E.2d 1329, all appellate court cases decided before *Morgan*. In *Medina*, the court upheld a trial court's suppression of a statement obtained during in-custody interrogation where the defendant was unrepresented by counsel. The ruling was supported by evidence that the officers knew that the accused had been advised by counsel *not* to talk but, after first refusing to do so, had later consented after being told that other witnesses had identified him as a perpetrator of the crime. In *Washington*, as in *Morgan*, the defendant had been frustrated in his attempt to obtain counsel and then decided to permit interrogation without counsel. In *Holmes*, the questioning continued without indication of waiver.

We conclude that the factual determination necessary to a denial of the motion to suppress was not contrary to the manifest weight of the evidence and that the ruling was not erroneous as a matter of law.

■■ The victim testified that before forcing her to have intercourse, the defendant forced an act of oral sex upon her. This alleged act of oral sex was the basis of the charge of deviate sexual conduct upon which defendant was acquitted at the previous trial. He contends that the admission of the testimony over his objection and contrary to the request of his in limine motion was reversible error. His argument is based upon the theory of collateral estoppel. In *People v. Haran* (1963), 27 Ill. 2d 229, 188 N.E.2d 707, the supreme court ruled reversible error to have occurred when in a trial on a charge of crime against nature, the trial court permitted the State to introduce evidence of intercourse between the defendant and the victim during the same episode in which the crime was alleged to have occurred. The defendant had been previously acquitted of a charge of statutory rape arising from that occurrence. The supreme court reasoned that an estoppel should have been invoked because the only issue on the statutory rape charge was whether the intercourse occurred and the acquittal conclusively established that it was not proven.

In *Ashe v. Swenson* (1970), 397 U.S. 436, 444, 25 L. Ed. 2d 469, 475-76, 90 S. Ct. 1189-94, the United States Supreme Court ruled that under certain circumstances, the Fifth Amendment privilege against double jeopardy precludes the introduction against a defendant of evidence of prior conduct attributed to him if his commission of that conduct was an issue in a prior jury trial which resulted in his acquittal. That court ruled that evidence of such conduct is inadmissible in the subsequent case if an examination of the entire record in the prior case shows that a "rational jury" could only have "grounded its verdict" upon a resolution of the issue which he "seeks to foreclose from consideration" in the subsequent case.

Defendant contends that the only rational basis to explain the verdict of the prior jury, acquitting him of deviate sexual assault, is that the jury decided that the proof of oral sex was insufficient. He argues that had that jury decided to acquit on the basis that the proof was insufficient to show his use of force and the lack of consent by the prosecutrix, that jury, to be rational, would also have been required to acquit him of the rape charge, which they were not able to do. His argument is based upon the supposition that the proof of use of force and lack of consent was the same as to both offenses. Neither the defendant nor the prosecutrix testified that either the oral sex or intercourse occurred with her consent. He testified that neither occurred. She testified that both occurred as a result of force and against her will. However, defendant did testify to making certain advances to the prosecutrix to which she consented just

prior to the time that the oral sex was alleged to have occurred and admitted to slapping her at a later time nearer the alleged intercourse. The first jury could rationally have had a collective reasonable doubt as to the lack of consent as to the deviate acts without reaching the same conclusions as to the lack of consent to the intercourse. The prior acquittal could rationally have been based upon a determination that the proof failed as to either the commission of the deviate acts or the use of force and lack of consent. The trial court correctly ruled that the collateral estoppel rule was not applicable.

■■ ■ The State also introduced, over the defendant's objection, the testimony of a friend of the victim who was an optometrist. He stated that, after the occurrence, she drove to his office and told him that defendant had raped her. We need not determine whether, as defendant claims, the lapse of time between the acts and the victim's statement to the witness prevents this testimony from qualifying for admission under the excited utterance exception to the hearsay rule. (See *People v. Poland* (1961), 22 Ill. 2d 175, 174 N.E.2d 804; *People v. Parisie* (1972), 5 Ill. App. 3d 1009, 287 N.E.2d 310.) In any event, the corroborative statement exception prevents the introduction of the testimony from being reversible error. Under that rule, evidence of a statement by a rape victim that she has been raped is admissible to rebut any inference that she had not been forced to engage in intercourse which might arise from her failure to complain. (*People v. Damen* (1963), 28 Ill. 2d 464, 193 N.E.2d 25.) This rule permits a longer time lapse between the act and the statement where, as here, the time lapse is explained by the witness' reluctance to excite the elderly lady who was the only other person present in the building where the acts occurred. The rule does not permit the introduction of evidence that the victim named the perpetrator of the offense (*Damen*) but where, as here, that person's identity is not disputed, we have ruled the error to be harmless (*People v. Hayn* (1976), 34 Ill. App. 3d 1029, 341 N.E.2d 182). No reversible error occurred here.

■■ The sentence of 14 to 50 years was severe. However, the crime of rape involves a severe deprivation of the rights of the victim even though a weapon is not used. The evidence at sentencing showed a long record of petty criminal conduct by defendant in addition to a prior conviction in Nebraska for assault with intent to rape and a Federal conviction for auto larceny. The trial judge properly considered not only the indication that rehabilitation of defendant would be very difficult but also the needs of society to be protected from him. The sentence was not an abuse of discretion. *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

The conviction and sentence are both affirmed.

Affirmed.

TRAPP, J., concurs.

Mr. JUSTICE REARDON, dissenting:

To bring into focus my dissent, I shall paraphrase certain evidence relating to defendant's motion to suppress.

Three interrogations of the defendant were conducted by detectives of the Decatur Police Department. The first session occurred on July 30, 1976, lasting from 7:43 p.m. until approximately 8:30 p.m. The second occurred between 1:36 a.m. and 2:30 a.m. on July 31, 1976. The third began at 9:30 a.m. on July 31, 1976, and lasted approximately 1 hour and 15 minutes.

At the first interview, defendant was given a Custodial Interview Advice Form listing each of the Miranda warnings and a waiver provision. After the form was read to the defendant, he initialed each right and printed "I want attorney" after the provision setting forth his right to have an attorney present at the interview. Also, after the waiver provision on the form, which stated that the reader understood the above rights and wished to make a statement, the defendant again printed the words "with attorney present today." At the suppression hearing two officers testified that the defendant requested an attorney after being advised of his rights. An officer testified that the police repeatedly made it clear to the defendant that he couldn't have a lawyer at the interview that evening because the procedure in Macon County required that he had to appear in court for that purpose. Defendant was permitted to phone the only attorney he knew but that attorney was unable to come to the police station at that hour. Two officers testified that defendant, after making the phone call, told them that the attorney advised him to go ahead and talk to them. Defendant denied this and asserts that he requested to be taken back to his cell until an attorney could be present. The prosecution concedes that defendant was taken back to his cell.

The second interview was conducted by another officer beginning at 1:36 a.m. The police awakened defendant from a sound sleep and this officer read defendant his rights from the previously described form. The officer claims that defendant did not request counsel at this interview but defendant asserts that he not only made such a demand but, in addition, made reference to *Escobedo* (*Escobedo v. Illinois* (1964), 378 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758), and *Miranda* (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602), and told the officer that once a defendant has requested an attorney, anything that comes after that is by compulsion. Apparently the defendant admitted some sexual activity at this time. Defendant's testimony is that he told the officer he didn't wish to talk about it but the officer persisted in the questioning.

The third interview was conducted by still another police officer who testified that after reading the *Miranda* rights off the same custodial interview form, defendant declined the services of an attorney and said he was perfectly willing to talk with him about the arrest. Defendant

denies this and says he again requested an attorney from the officer who was very nice to him and offered him a cigarette and coffee. Defendant testified that he did continue the interview and did answer some questions at this time because the officer persisted in asking him questions after his demands for an attorney were refused and disregarded because he was of the opinion that in view of *Escobedo* and *Miranda*, anything he said after a demand for an attorney could not be used against him.

The above review of the evidence highlights the problem wherein, I believe, the majority errs. To bring it into perspective we must remember that the defendant, in his own handwriting, twice claimed his constitutional right to have his attorney present before any questioning of him was conducted. In addition, the record reflects, and the prosecuting witnesses admit, that defendant made several similar oral requests. Despite these clear and unambiguous demands, three interviews of the defendant were instituted and engaged in by the police officers. There is no evidence nor contention that the defendant requested, volunteered, suggested, or in any manner invited the officers to his cell to continue or renew the interviews. The majority relies on *People v. Morgan* (1977), 67 Ill. 2d 1, 364 N.E.2d 56, and liken it factually to this case. The difference between the two cases is patently obvious. In *Morgan* the defendant asked for an attorney and questioning ceased. After an interlude of approximately 30 minutes the defendant asked a police officer if he could continue his statement. The officer was uncertain and asked the State's Attorney. Before continuing his statement, Morgan said he thought a lawyer would confuse him and he wished to proceed. These facts are miles away from the facts in this case. Our facts are quite similar to those in *People v. Henenberg* (1973), 55 Ill. 2d 5, 302 N.E.2d 27. There the defendant, while being questioned by Illinois authorities in the St. Louis, Missouri, Police Department building, asserted his desire to see a lawyer four times during the interrogation. The officers did not cease their interrogations. In *Henenberg* our supreme court said, "* * * the record shows that the defendant repeatedly told the officers that he wanted to consult with a lawyer. Nevertheless, interrogation continued until a confession was obtained. It follows that the motion to suppress should have been allowed." (55 Ill. 2d 5, 12, 302 N.E.2d 27.) Similarly the defendant here, after his demands for a lawyer went unheeded, would be returned to his cell, left alone for awhile, and then the questioning would begin anew with a different set of inquisitors.

It must be acknowledged that there is some difference between *Henenberg* and this case. Here the officers assert that the defendant told them, following his telephone conversation with the lawyer, that he should go ahead and talk to the police. Apparently the majority is willing to support the finding of the trial judge that the defendant willingly and

understandingly talked to the police and abandoned his previous requests for the help and assistance of counsel. I cannot bring myself to join in this conclusion. I am afraid that I, like Justice Goldberg in *Escobedo*, must conclude that " 'any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances.' *Watts v. Indiana* (1949), 338 U.S. 49, 59, 93 L. Ed. 1801, 1809, 69 S. Ct. 1347 * * *." (*Escobedo*, 378 U.S. 478, 488, 12 L. Ed. 2d 977, 984, 84 S. Ct. 1758.) The right to remain silent distinguishes our system of justice from an inquisitorial one. It complements and serves an accusatorial system and protects us from unwarranted governmental intrusion. For the majority to find shelter in the statements of the officers that after having advised defendant of his rights he voluntarily talked to the police is indeed leaning on a slender reed. We need only ask ourselves: What terminated the first interview with defendant? Why was it terminated? What triggered the second interview? Why was it not continued to a conclusion? Why the third interview? Is it logical to conclude that prisoners are awakened in the wee hours of the night just to chat? Is it not more logical to conclude that very little information was obtained by the police in the first interview, a little more was obtained in the second interview, and a substantial amount was elicited from defendant in the third session. If the defendant's responses were as voluntary as the police officers maintain, the initial interview would have been totally productive and the subsequent interviews would have been unnecessary. Since we know this did not happen, does it not become crystal clear that the police were operating in defiance of defendant's constitutional rights and that their conduct constituted a psychological "wearing down" of the defendant's will proscribed by *Miranda*? *Miranda* teaches us:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

This does not mean, as some have suggested, that each police station must have a 'station house lawyer' present at all times to advise prisoners. It does mean, however, that if police propose to interrogate a person they must make known to him that he is entitled to a lawyer and that if he cannot afford one, a lawyer will be provided for him prior to any interrogation. If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege so long as they do not question him during that time.

If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. *Escobedo v. Illinois*, 378 U.S. 478, 490, note 14, 12 L. Ed. 2d 977, 986, 84 S. Ct. 1758. This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson v. Zerbst*, 304 U.S. 458, 82 L. Ed. 1461, 58 S. Ct. 1019, 146 ALR 357 (1938), and we re-assert these standards as applied to in-custody interrogation. Since the State is responsible for establishing the isolated circumstances under which the interrogation takes place and has the only means of making available corroborated evidence of warnings given during incommunicado interrogation, the burden is rightly on its shoulders." 384 U.S. 436, 473-75, 16 L. Ed. 2d 694, 723-24, 86 S. Ct. 1602.

The psychological "wearing down" process described in *Miranda* appears in all of its ugliness here. The "good guy—bad guy" routine practiced on this defendant will serve as no ornament to dedicated law enforcement within the framework of constitutional and statutory law. In my judgment, finding it to be otherwise is contrary to the manifest weight of the evidence.

The motion to suppress should have been allowed. Accordingly, I dissent.